Filed 2/14/14  In re Armani M. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re Armani M., et al, Persons Coming Under the Juvenile Court Law. | |
| NAPA COUNTY HEALTH AND HUMAN SERVICES, Petitioner and Respondent, v. Ashley C. et al., Defendants and Appellants. | A138646 (Napa County Super. Ct. No. JV16754; JV17009) |

## I.  INTRODUCTION

Armani M. and his brother J.M. each became juvenile court dependents shortly after they were born.  In April 2013, when Armani M. was two and J.M. was one, the juvenile court terminated parental rights over both children and ordered a permanent plan of adoption.  (Welf. & Inst. Code, § 366.26.)[1]  On appeal, the boys' mother Ashley C. (Mother) contends that the court erred by terminating her parental rights and refusing to appoint the boys' maternal great grandmother as their guardian.  The boys' father Rodney M. (Father) joins Mother's arguments but adds nothing to them.  We affirm.

---

[1]  Subsequent statutory references are to the Welfare and Institutions Code.

## II. STATEMENT OF FACTS

### A. *Proceedings in 2011*

In March, the Napa County Department of Health and Human Services (the Department) filed a juvenile dependency petition on behalf of Armani, who was born earlier that month. The petition alleged Armani came within the court's jurisdiction under section 300 subdivision (b) (section 300(b)) because of his parents' failure or inability to protect him from physical harm or to provide regular care for him.[2]

Factual allegations against Mother included that she tested positive for marijuana when Armani was born; she left her one-day-old son unattended in their hospital room for 10 minutes while she went to meet Father; and, when Armani was less than two weeks old and still nursing, Mother left him with his maternal great grandmother for 16 hours without making arrangements for his food or giving any indication when she would return. Factual allegations against Father included that he had an extensive criminal history; he failed to reunify with an older child; the mother of one of his children obtained a restraining order against him for domestic violence; he had a prior arrest for domestic violence against Mother; and he was homeless.

A contested detention hearing was conducted on March 16. The Department's initial plan had been to detain Armani from Father only and to place him with Mother in protective custody in the home of the maternal great grandmother, Carolyn B. However, at the hearing, the Department requested that the court detain Armani from both parents

---

[2] Section 300(b) states in relevant part: "Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: . . . [¶] (b) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse. . . ."

pursuant to an amended petition that alleged that the Department social worker observed both parents engage in "volatile and threatening" behavior toward Carolyn B. in the presence of the baby. The Department had also discovered that, a few months before Armani was born, Father tested positive for methamphetamine and had been placed on a psychiatric hold because he was hallucinating. At the conclusion of the contested hearing, Armani was removed from the custody of both parents.

On April 21, the juvenile court exercised jurisdiction over Armani. Father was in custody at the time and submitted the matter. Mother also submitted to the allegations in the petition. However, she advised the court that she had a job, had completed two different parenting programs, had an appointment with a safe-housing program, and had started a drug court program.

A disposition hearing was held on May 10. The Department reported that Armani had adjusted well to a foster care placement. Mother's drug tests were negative, she had completed some parenting programs, and she was attending her appointments. Mother had twice weekly visits, though some were cut short because of her work schedule. The Department had obtained additional information about Father's history of domestic violence against at least three women and was also very concerned about public verbally abusive altercations between Mother and Father. The court found Mother had made "moderate" progress toward alleviating or mitigating the causes necessitating the out of home placement, while Father's progress was "minimal." It ordered reunification services to both parents and adopted case plans proposed by the Department.

In October, the Department filed a six-month review report in which it recommended that services to Father be terminated because of his erratic, unstable behavior and noncompliance with his case plan. Mother was pregnant with Father's child and was due in January. However, she had obtained a restraining order against Father, was working full time and had complied with her case plan. Furthermore, Armani had been living with Mother since October 4 on a trial home visit which was going well. Therefore, the Department recommended that Armani be returned to Mother's care with family maintenance services.

The six-month review hearing was held on October 27. The juvenile court terminated services to Father because of noncompliance with his case plan and then continued the hearing so the Department could amend its recommendations pertaining to Mother. Thereafter, the Department filed an addendum report recommending that the out of home placement continue with reunification services to Mother. Mother had recently admitted that she spent "significant" time with Father while Armani was in her care for a trial home visit notwithstanding that she had a restraining order against him. Then, on October 20, she told the social worker that bruises on her arm were the result of her running into light switches. From October 20 to 24, Mother left Armani with Carolyn B. while she spent more time with Father. During this period she also missed at least two program appointments because of illness. After Mother left Armani with Carolyn B. for another entire day on October 25, the Department terminated the trial home visit.

Armani's six-month review hearing was completed on November 3. Mother acknowledged she had gone off track and expressed an intention to "do the things that are important for her to get back to a place of family maintenance." Mother and the court agreed that interactions with Father were a primary concern. The court advised her to call the police if Father came to her house. The court adopted the Department's recommendations, finding, among other things, that reasonable services had been provided and moderate progress had been made, but that Armani could not be safely returned to Mother's care.

## B. *Proceedings in 2012*

In January 2012, Mother gave birth to her second son, J.M. Shortly thereafter, the Department filed a section 300(b) petition on behalf of J.M., who showed signs of opiate withdrawal when he was born. The Department alleged that J.M. faced a risk of harm because of the circumstances relating to the failed October 2011 trial home visit between Mother and Armani, and the domestic violence relationship and ongoing contact between Mother and Father. When J.M. was released from the hospital, he was taken into protective custody and placed in the home of his maternal great grandmother, Carolyn B.

4

J.M.'s detention hearing was held on January 31. The Department reported that both parents posed a risk of harm to J.M. because of their unsafe and unstable relationship, Mother's inability to maintain boundaries with Father, Father's emotional control over Mother, and both parents failure to address the problems that led to Armani's dependency. At the conclusion of the hearing, J.M. was detained from both parents.

On March 6, the court held a jurisdiction hearing for J.M. The Department reported that, on December 31, 2011, the police had found Father hiding in Mother's closet and arrested him for violating the restraining order. On January 10, Mother went to court and terminated the restraining order notwithstanding that she was advised such action could jeopardize her reunification efforts. Mother denied there were domestic violence problems with Father and was angry about J.M.'s dependency case because she felt that she had "done everything [she] was supposed to" in Armani's case. Nevertheless, both Mother and Father submitted on the Department's report and the court sustained the allegations in J.M.'s petition.

On March 27, the court conducted a disposition hearing for J.M. The Department recommended that the court order reunification services for Mother but deny services to Father. Mother had obtained housing, Father was in a 60-day inpatient substance abuse treatment program, and the social worker did not know if the parents were still a "romantic couple." J.M. and Armani were both living with Carolyn B. Mother visited the children four days per week, supervised by Carolyn B. She also had an additional visit per week supervised by the Department. The court adopted the Department's recommendations for Mother and continued the matter for Father who contested the Department's recommendation and requested a hearing. At the continued hearing, Father failed to appear and the court denied him reunification services.

On April 10, the court conducted a 12-month review hearing in Armani's case. The Department recommended that Armani be returned to Mother based on evidence that she had complied with her service plan, participated in regular visits and was responsive to her child's needs. The court found that Mother had made "substantive" progress

toward alleviating or mitigating the causes necessitating jurisdiction, and returned Armani to her care with family maintenance services.

On August 31, 2012, the Department prepared a report and recommendation in anticipation of J.M.'s six-month review which was scheduled for September 13. The Department recommended returning J.M. to Mother with family maintenance services. The Department reported that J.M. had been staying with Mother and Armani on an extended home visit which was going well. Furthermore, although there was a recent concern about the stability of Mother's housing, she had complied with most of her case plan, especially the provisions requiring her to stay away from Father.

On September 3, Mother called the police and reported that Father had assaulted her and stolen her cell phone and keys. When police arrived, two people were "passed out" in Mother's living room and the apartment "was cluttered with alcohol containers." The police did not observe visible injuries on Mother, who said she would press charges but did not want to testify in court. Later that day, Father contacted the police and denied that he assaulted Mother. Father reported that he had been living with Mother for three months and that she was his SSI payee.

On September 3, Mother reported the domestic violence incident to the Department and told the social worker she was worried for her safety because Father still had her keys. The social worker told Mother to take Armani and J.M. to a safe place. During an interview the following day, Mother denied that Father had been living with her but admitted he had spent time there and had unauthorized access to the children. Mother had bruises on her shoulder and back which she did not show to the police because she did not want to get Father in trouble. Mother also admitted that she was Father's SSI payee and told the social worker that he is "a really nice guy when he is not on drugs."

On September 7, the Department filed a supplemental petition on behalf of Armani, seeking to remove him from Mother's home in light of the September 3 incident. By that time, the Department had already terminated J.M.'s home visit and returned him to the care of Carolyn B. According to the allegations in the supplemental petition,

6

Father entered Mother's apartment, grabbed her by the hair and punched her in the face with a closed fist in front of Armani and J.M; Mother left the children in the apartment with Father when she ran out to call police; Mother declined an offer by police to file an emergency protective order and hid her injuries from the officer because she did not want Father to go to jail. The Department also alleged that Father had admitted he had been living with Mother for several months; Mother admitted she let Father visit and have unauthorized contact with the children; Mother's landlord had received multiple complaints of noise and arguing in Mother's apartment and intended to evict her; and Mother allowed friends who were under the influence to stay at her home while the children were present.

On September 11, the court held a contested detention hearing for Armani. Mother denied that Father had been living with her; she claimed that she had a friend who looked similar to father. According to Mother, the reason Father had access to her home was that her friend accidentally left the front door unlocked the night before because she was intoxicated. Mother also stated that the children slept through the entire incident and that the reason she did not show the police her injuries was that she was insecure about her body. The juvenile court detained Armani from Mother and the Department placed him with Carolyn B., who was already caring for J.M.

On October 1 and 2, the court conducted its six-month review in J.M.'s case. Pursuant to an addendum report prepared after the domestic violence incident, the Department recommended that the court terminate services to Mother and schedule a section 366.26 hearing for J.M. After a contested hearing, the court terminated services to Mother and ordered a section 366.26 hearing.

On October 31, and November 30, the court conducted a jurisdiction hearing on Armani's supplemental petition. The Department recommended that the court deny Mother services and schedule a section 366.26 hearing. After a contested hearing, the court found that all of the allegations in the supplemental petition were proven true except for the allegation that Father lived with Mother for several months. The court also found the prior disposition of returning Armani to Mother with maintenance service was

7

ineffective, and that Mother had made only "moderate" progress toward alleviating or mitigating the causes necessitating placement. Accordingly, the court terminated reunification services with Armani and ordered a section 366.26 hearing.

After the boys' cases were referred for a section 366.26 hearing, Mother's counsel filed a request for appointment of an expert witness to assist Mother in establishing that terminating her parental rights would be detrimental to the children because she had formed a beneficial parent-child relationship with them. On December 21, the juvenile court granted Mother's request and appointed Dr. Valerie Fox to perform an evaluation regarding the attachment between Mother and the boys.

## C. *Proceedings in 2013*

### 1. *Events Prior to the Section 366.26 Hearing*

In March, the Department filed a section 366.26 report recommending that the court terminate Mother's and Father's parental rights and approve a permanent plan of adoption for both Armani and J.M. It advised the court that the boys had a good relationship with each other and that it "would be detrimental if sibling ties are not maintained." Furthermore, the Department had determined that both boys were adoptable and prospective adoptive parents had been identified.

In its report, the Department opined that ongoing "minimal" contact with both parents would be in the children's best interest, but it did not recommend visitation with Father. Furthermore, the Department was concerned that physical visits with Mother during the transition into the adoptive home would be counterproductive. The Department also believed that future visits with Carolyn B. would be "appropriate" since the boys had lived the majority of their lives with her. However, again there was concern about visits during the transition period because the Department was concerned that Carolyn B. would allow Mother to see the children during her visits.

Adoption assessment reports for each boy were attached to the Department's section 366.26 report. Those reports summarize the history of the dependency cases, the Department's efforts to identify alternative placements for the children, and the

8

circumstances supporting the Department's ultimate conclusions that there were no impediments to adoption and that it was likely the boys would be adopted.

According to the adoption assessment reports, Carolyn B. was committed to providing care for both boys as "a substitute care provider." But, because of her age, she did "not feel that she would be the best permanency resource" for them. The reports acknowledged that Carolyn B. had expressed a desire to adopt Armani and J.M. But she ultimately concluded that adoption was a better option: "The caregiver believes that Armani and [J.M.] need a safe place to grow up considering the violence they have already witnessed between their parents. However, there are concerns by both the caregiver and the Department as to the caregiver's ability to continue to care for the siblings as the family grows older. The caregiver stated that she has excellent health and a family history of longevity; however, she acknowledges that as her age advances she will be less able to meet the challenges of raising Armani and [J.M.] as they eventually develop into adults. This has been a difficult decision for the relative caregiver, but she believes that there is a family better able to meet [the boys'] needs as they grow older."

On March 12, the boys' Court Appointed Special Advocate (CASA) filed a report in anticipation of the section 366.26 hearing. The CASA had been working with the family since November 2011 and had weekly visits with the boys at the home of Carolyn B. The CASA reported that the boys share a close sibling relationship and are both attached to Carolyn B. The CASA also reported that Carolyn B. told her that she was often tired because the boys did not sleep through the night. Carolyn B. described the boys as very active and acknowledged that caring for them was "challenging." The CASA advised that the permanency of an adoption would be in the best interests of the children and recommended that the "planned permanent living arrangement of adoption for Armani and [J.M.] be ordered."

On March 14, Carolyn B. filed a request to be declared the de facto parent of both Armani and J.M. Her uncontested requests were granted on March 21.

In April, the Department filed an addendum report in which it advised the court that Mother and Father continued to have contact with each other in violation of a

9

restraining order. On one occasion, Mother and Father were seen socializing together. On another occasion, Father showed up at Mother's supervised visit with the boys notwithstanding that the social worker told him not to. According to the report, "mother appeared pleased with the father's presence and in fact took pictures of him with the children" before Father was asked to leave.

## 2. *The Section 366.26 Hearing*

On April 29, a contested section 366.26 hearing was held for both Armani and J.M. Gusto Curtis, the Department social worker who prepared the adoptions assessments, testified at the hearing. Curtis reiterated his conclusions that both Armani and J.M. are adoptable. As he explained, the primary factors for determining adoptability are the age of the child, his physical health and his emotional, psychological and social health. Curtis concluded that all of these factors indicated that both boys are likely to be adopted.

Curtis testified that Carolyn B. had told him that she wanted to adopt the boys but that she felt there was "a more appropriate home" for them. Curtis recalled that during the adoption assessment process Carolyn B. "wavered back and forth many times" about whether she wanted to adopt the children. During one conversation, Curtis and Carolyn B. discussed what it would be like when the boys were teenagers and she was older and Carolyn B. said she had younger relatives who could help her care for the boys. Ultimately, Carolyn B. decided to "withdraw her participation" from the home study process.

Curtis testified that Armani and J.M. had a positive bond with Carolyn B. who was their primary caregiver and that there was evidence that Mother had been affectionate and attentive to the children during her visits with them. But, he believed that maintaining an ongoing relationship with Mother would be detrimental to the boys because of her history of making poor choices regarding her relationship with Father, and of exposing them to "domestic violence, substance abuse, and people with questionable mental health."

Curtis testified that the Department had reviewed and agreed with the conclusions of Mother's expert, Dr. Valerie Fox. Dr. Fox summarized the results of her

10

psychological evaluation of Mother in a report dated April 15, 2013, which was admitted into evidence at the hearing over Mother's objection. Mother's psychological testing revealed that she had a "histrionic personality disorder, emotionally unstable with passive aggressive and depressive traits." Consequences of this disorder included that Mother became overconfident when things appeared to be going her way and felt sorry for herself when things did not go well. In addition, "[w]ith respect to authorities, [Mother] is superficially compliant but inwardly very resentful of being told what she can or cannot do. Thus, she may readily agree to something and then do the opposite and feel no guilt about it."

Other conclusions by Dr. Fox included that (1) Mother has a strong need for immediate gratification which makes it difficult for her to foresee long term consequences, and (2) Mother has an anxiety disorder which when combined with her personality disorder makes it difficult for her to benefit from therapy. Regarding Mother's attitude toward parenting and her children, Dr. Fox opined that Mother perceives parenting responsibilities as burdensome, that she receives some pleasure from being a parent but not a lot, that she perceives herself as very involved in her children's activities, and that she experiences frustration trying to communicate with the boys but also feels she has some control over them and has established guidelines for their behavior.

In her report, Dr. Fox recommended that the boys be placed in a "stable, two parent home." Based on her testing and observations of Mother and the boys, Dr. Fox concluded that the boys had formed a moderate bond with Mother but that their primary emotional bond was with Carolyn B., who was not a candidate for adoption because she was 69 years old and could not provide a stable two parent home with a positive male role model. Dr. Fox also opined that the fact that the boys had demonstrated their ability to bond with a person who would provide them with "quality caregiving," as Carolyn B. had, meant that it was important to give them the opportunity to "develop a healthy attachment to their future parents as soon as possible."

11

Carolyn B. testified at the hearing that she is committed to providing a stable and loving home for the boys and that she would "prefer" to be the adoptive parent for them. Carolyn B. denied ever telling anyone at the Department that she believed she was too old to take care of the boys. However, she testified that the Department social worker Gusto Curtis told her she was too old to adopt when Armani was "just a baby" and that later an employee from the state adoption service also told her she was too old. After that, Carolyn B. "kind of gave up the hope of being able to take care" of the boys until several months before the section 366.26 hearing when she was told that it would be discrimination to prevent her from adopting the boys because of her age. At that point, Carolyn B. submitted her application to adopt the boys.

Carolyn B. testified that, after she completed the adoption paperwork, Gusto Curtis came to her home to discuss the adoption process. Curtis expressed concerns about her age. Those concerns made Carolyn B. feel "guilty" about wanting to adopt the boys and also made her feel "that I was too old." That was why she told Curtis to withdraw her request to adopt the boys. After her conversation with Curtis, Carolyn B. did not consider adopting again until after the prospective adoptive parents had been identified. Carolyn B. did not think that the prospective adoptive parents were the right people to adopt Armani and J.M. She objected to the fact that the prospective adoptive father was in law enforcement, to the way the prospective adoptive mother interacted with the boys, and especially to the fact that they did not want an open adoption.

Carolyn B. testified that she believed that Armani had bonded with Mother and that J.M. had bonded with her. She opined that transitioning Armani to the adoptive parents would "destroy him." However, she also testified that she believed the boys were "adoptable" if by the "right people." She explained: "It's a lot. These babies take a lot of time, a lot of patience. It cannot be anyone that's, you know, has anger management issues or a short temper, you know. They have to have a lot of patience. They'd have to want to love these children. . . . [a]nd care about them."

Kimberly Smith, the Department social worker for both Armani and J.M., testified she did not believe Mother had a beneficial parental relationship with the children. In her

12

opinion, the children viewed Mother as a "friendly visitor," and saw Carolyn B. as a "maternal figure." When asked whether the boys could transition from Carolyn B. to an adoptive family, Smith responded: "I think if done with sensitivity, done properly, absolutely." Smith had seen comparable transitions in other cases that were successful.

Mother testified that she disagreed with the social worker's assessment of her relationship with the boys; Mother believed the children viewed her as their mother. During visits, they call her "mama," they are happy to see her and sad when she leaves. She feeds them, bathes them, plays with them, "just normal mom and kid things." Mother also testified that she disciplines the children and sets boundaries for them. She believed her children were bonded to her and that it would be detrimental for them not to have a relationship with their mother.

At the conclusion of the hearing, the court found that it needed to resolve two distinct issues (1) adoptability, and (2) whether there was a beneficial parental relationship. Regarding the first issue, the court found that the Department met its burden of establishing that Armani and J.M. are adoptable. Turning to the second issue, the question was whether the parents had carried their burden of establishing a beneficial parental relationship that should be preserved. The evidence regarding the Mother's relationship with the boys was mixed; some evidence portrayed her as a friendly visitor and other evidence as a parent figure. However, the court found, even if it determined there was a parental relationship, Mother had to show that the benefits of that relationship outweighed the benefits of adoption. The court concluded that Mother could not make that showing, particularly in light of the conclusions of Dr. Fox, which the court characterized as both professional and unbiased.

Ultimately, the court found that the boys were adoptable and the benefits of maintaining a relationship with Mother (and with Carolyn B.) did not outweigh the benefits of adoption. Thus, it rejected the parents' proposal of a guardianship as an alternative to adoption and ordered that the parental rights of both Mother and Father were terminated.

# III.  DISCUSSION

## A.  *Overview of Statutory Framework*

" 'The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time.' [Citation.] When the child is removed from the home, the court first attempts, for a specified period of time, to reunify the family.  [Citation.]"  (*In re Celine R.* (2003) 31 Cal.4th 45, 52 (*Celine R.*).)  However, if reunification efforts have failed and reunification services are terminated, " 'the focus shifts to the needs of the child for permanency and stability.' [Citation.]"  (*Ibid.*)

"The section 366.26 hearing is a critical late stage in a dependency proceeding. The child has been under juvenile court jurisdiction for an extended period following the dispositional order, and the court has held one or more review hearings to consider a return to parental custody.  [Citation.]  At the section 366.26 hearing, the focus shifts away from family reunification and toward the selection and implementation of a permanent plan for the child.  [Citation.]  Section 366.26 sets out 'the exclusive procedures for conducting these hearings.'  [Citation.]  If adoption is likely, the court is *required* to terminate parental rights, unless specified circumstances *compel* a finding that termination would be detrimental to the child.  [Citations.]"  (*In re S.B.* (2009) 46 Cal.4th 529, 532-533, fn. omitted, emphasis added; see also *Celine R., supra*, 31 Cal.4th at pp. 52-53.)

"By the time of the section 366.26 hearing, family preservation is not an object of the statutory scheme.  Family preservation is of critical importance from the time the minor is removed from parental custody [citation] through the reunification period. However, when reunification efforts cease, the scale tips away from the parent's interest in maintaining family ties and towards the child's interest in permanence and stability. [Citation.]  At that point, adoption becomes the preferred permanent plan.  [Citations.] Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the

14

dependent child. [Citations.]" (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1344-1345.)

"Because adoption is more secure and permanent than a legal guardianship or long-term foster care, adoption is the Legislature's first choice for a permanent plan for a dependent minor child who has not been returned to the custody of his or her parents and who is found by the dependency court to be adoptable. [Citations.] To avoid termination of parental rights and adoption, a parent must demonstrate that one or more of the section 366.26, subdivision (c)(1)(A) or (B) exceptions to termination of parental rights applies to his or her child. The parent has the burden of proof on the issue. [Citation.] Because a parent's claim to such an exception is evaluated in light of the Legislature's preference for adoption, it is only in exceptional circumstances that a court will choose a permanent plan other than adoption. [Citation.]" (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.)

**B.** *Issues Presented and Standard of Review*

In the present case, the juvenile court found that Armani and J.M. are adoptable. Mother (and Father) do not challenge this finding on appeal. Thus, as reflected in the authority summarized above, the juvenile court was *required* to terminate parental rights and select the permanent plan of adoption unless a circumstance specified in section 366.26 *compelled* a finding that terminating parental rights would be detrimental to the boys. (*In re S.B., supra*, 46 Cal.4th at pp. 532-533.)

Here, Mother contends that two statutory exceptions set forth in section 366.26 precluded the juvenile court from terminating her parental rights to Armani and J.M.

First, Mother invokes section 366.26 subdivision (c)(1)(A), the relative caregiver exception, which states that the court is not required to terminate parental rights over an adoptable child if: "(A) The child is living with a relative who is unable or unwilling to adopt the child because of circumstances that do not include an unwillingness to accept legal or financial responsibility for the child, but who is willing and capable of providing the child with a stable and permanent environment through legal guardianship, and the removal of the child from the custody of his or her relative would be detrimental to the emotional well-being of the child. . . ."

Second, Mother relies on section 366.26 subdivision (c)(1)(B)(i), the beneficial parental relationship exception, which provides that parental rights need not be terminated if: "(B) The court finds a compelling reason for determining that termination would be detrimental to the child . . . [because]: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."

Mother seeks reversal of the order terminating her parental rights on the ground that substantial evidence does not support the juvenile court's findings that these exceptions do not apply. However, Mother's framing of these issues fails to account for the fact that she carried the burden of proof in the lower court. (See *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.) The substantial evidence test "is typically implicated when a defendant contends that the plaintiff succeeded at trial in spite of insufficient evidence. In the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case [citations]." (*Ibid.*)

"Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' [Citation.]" (*In re I.W., supra,* 180 Cal.App.4th at p. 1528.)

## C.    *The Relative Caregiver Exception*

Application of the relative caregiver exception requires three findings: (1) the relative caregiver is unwilling or unable to adopt the child because of circumstances that

16

do not include an unwillingness to accept legal or financial responsibility for the child; (2) the relative caretaker is willing and capable of providing the child with a stable and permanent environment through legal guardianship; and (3) removing the child from the relative caretaker's custody would be detrimental to the child's emotional well-being. (*In re K.H.* (2011) 201 Cal.App.4th 406, 415.)

Mother's first contention on appeal is that the juvenile court erred as a matter of law because it applied the incorrect legal test for determining whether the relative caregiver exception applies; according to Mother, the sole reason the court gave for rejecting this exception was that the evidence shows that the boys are capable of forming a new bond with an adoptive mom and dad.

Mother mischaracterizes the juvenile court's ruling. The record before us reflects that the question whether the relative caregiver exception applies in this case was raised for the first time during witness testimony at the section 366.26 hearing. The juvenile court permitted Mother to elicit evidence relevant to the issue. Ultimately, the court made an implicit finding that this exception does not apply by terminating parental rights and ordering adoption as the permanent plan for the boys. However, the court did not make any express finding regarding the relative caregiver exception. Thus we reject Mother's erroneous factual contention that the court applied the wrong test for determining whether the relative caregiver exception applies.

Mother's second contention is that evidence presented at the section 366.26 hearing compels the conclusion that the relative caregiver exception applies in these dependency cases. However, in crafting this argument, Mother overlooks conflicting and competing evidence that is inconsistent with her claim of error.

For example, Mother contends that Carolyn B. was ready and willing to provide the boys with a stable permanent home but that she was unable to adopt them because the Department told her she was too old. However, as reflected in our factual summary, the Department social worker testified that Carolyn B. wavered back and forth about whether she wanted to adopt and it was she who ultimately decided to withdraw from the home

17

study process. The record also contains evidence that Carolyn B. regretted her decision not to pursue adoption only because she did not like the prospective adoptive parents.

Mother also contends that the record establishes that Carolyn B. was willing to adopt the boys if necessary but that she preferred to serve as a legal guardian. As best we can tell, Carolyn B. never expressed a preference for legal guardianship. Indeed, the record citations upon which Mother relies includes Carolyn B.'s testimony that she would "prefer to be the adoptive parent." Furthermore, when read as whole, Carolyn B.'s testimony indicates that her preference was to prevent the prospective adoptive parents from adopting the boys and that she was willing to adopt them herself to avoid that from happening.

Indeed, the evidence and testimony about Carolyn B.'s commitment to providing the boys with a permanent and stable home is ambiguous. Her wavering about whether or not to adopt could be interpreted as hesitancy or misgivings about assuming the role of a permanent caregiver for the boys, whether as a guardian or an adoptive parent. It appears that it was this hesitancy which led the Department to look for non-relative adoptive parents for the boys. In other words, the evidence in this record does not compel the conclusion that Carolyn B. was unable or unwilling to adopt the boys but that she had committed to providing them with a permanent stable home.

Furthermore, the relative caregiver exception cannot be applied unless the parent proves that removal from the relative caregiver's home would be detrimental to the emotional well-being of the child. (*In re K.H., supra*, 201 Cal.App.4th at p. 415.) Mother appears to assume that evidence of the bond between Carolyn B. and the boys conclusively establishes that removing them from her custody would be detrimental to their emotional well being. However, that assumption is not supported by any evidence. It is also inconsistent with the conclusions of both the Department and of Mother's own expert, whose reports support the juvenile court's finding that transitioning the boys into a stable two parent adoptive family would not be detrimental to their emotional well being.

It is not our role on appeal to revisit the lower court's resolution of conflicting and competing evidence. (*In re I.W., supra*, 180 Cal.App.4th at p. 1529.) As the court observed in *In re I.W.*, many dependency cases pose evidentiary conflicts and obligate "the juvenile court to make highly subjective evaluations about competing, not necessarily conflicting, evidence." (*Id.* at p. 1528.) When, as here, the juvenile court's ruling reflects that it considered conflicting, competing evidence and "essentially discounted mother's evidence in concluding that mother had failed to carry her burden of proof," it "is not our function to retry the case." (*Ibid.*)

Ultimately, "[t]his is simply not a case where undisputed facts lead to only one conclusion." (*In re I.W., supra*, 180 Cal.App.4th at p. 1529.) Therefore, we reject Mother's contention that the juvenile court was compelled to apply the relative caregiver exception.

**D.      *The Beneficial Parental Relationship Exception***

"When contesting termination of parental rights under the statutory exception that the parent has maintained regular visitation with the child and the child will benefit from continuing the relationship, the parent has the burden of showing either that (1) continuation of the parent-child relationship will promote the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents [citation] or (2) termination of the parental relationship would be detrimental to the child. [Citation.] Put another way, DCFS is not required to produce evidence demonstrating that a minor would *not* benefit from continued parental contact. [Citation.]" (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.)

"To overcome the preference for adoption and avoid termination of the natural parent's rights, the parent must show that severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be greatly harmed. [Citations.] A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent. [Citation.] A child who has been adjudged a dependent of the juvenile court

should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree, but that does not meet the child's need for a parent. [Citation.]" (*In re Angel B. supra,* 97 Cal.App.4th at p. 466.)

On appeal, Mother contends that she satisfied the requirements of the parent-child relationship exception through evidence of her consistent visitation and of the positive interactions and bond she formed with the boys during those visits. Once again though, Mother simply ignores the conflicting evidence on this issue which indicated that Mother's relationship with the boys was that of a friendly visitor, rather than a parent. Furthermore, Mother does not identify any concrete evidence to support her claim that the benefits of preserving her parental relationship with the boys outweighs the benefits of adoption and the permanency and stability of that statutory preference.

"The parent has the burden of proving that termination would be detrimental to the child under section 366.26, subdivision (c)(1)(A). [Citations.] The juvenile court may reject the parent's claim simply by finding that the relationship maintained during visitation does not benefit the child significantly enough to outweigh the strong preference for adoption. . . . Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.) Mother fails to identify any extraordinary circumstance that required the juvenile court to preserve her parental rights.

## IV. DISPOSITION

The juvenile court orders terminating the parental rights of Mother and Father and selecting adoption as the permanent plan for Armani M. and J.M. are affirmed.

_____

Haerle, J.

We concur:


_____

Kline, P.J.


_____

Brick, J.*



* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.