[No. F062295. Fifth Dist. Nov. 30, 2011.]

In re K.H., et al., Persons Coming Under the Juvenile Court Law.
MADERA COUNTY DEPARTMENT OF SOCIAL SERVICES, CHILD
WELFARE SERVICES, Plaintiff and Respondent, v.
N.M., Defendant and Respondent;
K.H., et al., Appellants.

## COUNSEL

Marin Williamson, under appointment by the Court of Appeal, for Appellants.

Douglas W. Nelson, County Counsel, Miranda P. Neal and Woodrow C. Whitford, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Defendant and Respondent.

## OPINION

**GOMES, Acting P. J.**—K.M. and K.H. (hereafter referred to individually by their respective initials or collectively as the children) appeal from the Welfare and Institutions Code section 366.26 orders designating legal guardianship with their maternal grandparents as their permanent placement.[1] This placement was based on the juvenile court's finding that the exception to termination of parental rights and adoption of section 366.26, subdivision (c)(1)(A), which governs a child living with a relative who is "unable or unwilling to adopt the child because of circumstances that do not include an unwillingness to accept legal or financial responsibility for the child," applied

---

[1] All statutory references are to the Welfare and Institutions Code.

in this case. The children contend the juvenile court erred in applying this exception because it was required to find the relative caregiver's inability or unwillingness to adopt was due to "appropriate circumstances." We disagree and affirm the orders.

## FACTUAL AND PROCEDURAL BACKGROUND

In May 2010, the Madera County Department of Social Services, Child Welfare Services (Department) initiated dependency proceedings over then three-year-old K.H. and six-month-old K.M. after their mother, N.M. (mother), was arrested for trespassing in an occupied house with the children. The police took the children into protective custody as mother was unable and unwilling to make a plan for their care due to her mental health issues. The children were detained and placed with their maternal grandmother, Brenda O.

This was not the first time the family had come to the Department's attention. In November 2009, the Department received two referrals stemming from mother's hospitalization for a section 5150 evaluation. In the first, no caregiver was available for K.H. when mother was hospitalized, while in the second, mother had given birth to K.M. and the hospital staff reported concerns about K.M.'s safety due to mother's bizarre behaviors. The first referral was "evaluated out" after Brenda took K.H. into her care, while the second was closed after Brenda agreed to assist mother in caring for K.M. The Department received two more referrals in February 2010. The first reported that mother was exhibiting bizarre behavior and walking into people's apartments uninvited, and the second reported that while mother was in a Department office, K.M. was dirty and screaming, and mother refused to supervise K.H. In the second referral, mother admitted to the responding social worker that she was unable to supervise and care for the children. The referral was closed after the maternal grandfather picked up mother and the children and took them to his home, where the maternal grandparents cared for the children until April 7, 2010, when mother took the children to stay with her at a rescue mission.

The juvenile court found true the allegations of an amended petition which alleged the children came under section 300, subdivisions (b), (j) and (g), due to mother's failure and inability to supervise the children due to her mental illness, and because the children's half sibling, A., was declared a dependent under section 300, subdivisions (b) and (g), and mother continued to suffer from severe mental health issues that led to his removal and termination of mother's reunification services in August 2004. In August 2010, the juvenile court declared the children dependents of the court, continued their relative placement, and denied reunification services to mother under section 361.5,

subdivision (b)(10) based on her failure to reunify with A. and to make reasonable efforts to treat the problems that led to A.'s removal. The court ordered visitation for mother and set a section 366.26 hearing.

In a report prepared for the hearing, State Department of Social Services (CDSS) adoption specialist Mary F. Wilson stated that CDSS had determined the children were adoptable as they were in good health with no current developmental delays. Wilson noted, however, that the children's current relative care providers (grandparents) were unwilling or unable to commit to adopting the children, although they were willing to commit to a permanent plan of legal guardianship. Accordingly, CDSS recommended a permanent plan of legal guardianship with the grandparents without termination of mother's parental rights.

Wilson stated the children had adjusted successfully to placement with their grandparents, where they had been since their detention, while making steady improvements in physical and emotional development. The children appeared successfully bonded to their grandparents and they all operated as a family unit. The grandparents had been the one stable factor in the children's lives, as they had consistently come forward to take responsibility for their care when mother had mental health and legal problems, and were willing and committed to providing the children with a permanent home through legal guardianship. In Wilson's opinion, the children and grandparents had close and loving attachments, and the detriment of separation from the grandparents outweighed the prospects of placement with another, unknown family or even another family member. Wilson noted that Department case records showed mother had maintained monthly contact with the children through visits supervised by either the Department or the grandparents, and recommended mother's supervised visits continue as long as the visits were not detrimental to the children's emotional stability.

The Department assessed the grandparents, 47-year-old maternal grandmother Brenda O. and her husband, 51-year-old Kirk J., for guardianship. The couple has two children together. Kirk is also the father of two other adult children and he raised Brenda's daughter, N.M., since she was two. The Department stated that the grandparents and children appeared to be quite bonded to each other, and the family has a good support system. The grandparents were aware of the children's needs for stability and affection, and were committed to providing a stable loving environment for them. The Department recommended the grandparents be approved as the children's legal guardians and dependency dismissed.

A contested section 366.26 hearing was held at the request of children's counsel. Kirk testified that he is the children's "granddad" and while he is not mother's biological father, he raised her since she was two years old and she considered him a father figure. Kirk was asking for guardianship over the children rather than adoption because "I'm just looking at the best interest for the kids and I'd just like to keep my family together." He was willing to keep the children in his home as a permanent plan, provide for them throughout their childhood and was capable of supporting them financially. Kirk was not willing to adopt the children if the court ordered adoption as the permanent plan, however, because he had been in mother's life since before the children were born and he "wouldn't quit my kids and I have to see them through. They need help. They need me. So it's not—it's not nothing that I have to do as a grandparent is adopt." Kirk recognized his commitment now was to the children, but he understood he could raise them without adopting them. Kirk admitted there was nothing that precluded him from being able to adopt the children if he wanted to and the only reason he would not adopt them was because he was unwilling to do so.

Wilson testified that while she found the children adoptable, she recommended legal guardianship as their permanent plan because the children were living with relatives who were committed to providing a permanent plan through legal guardianship, and the children had relationships with the relatives since they were born. Wilson had discussed the options with the grandparents, including the differences between adoption and legal guardianship, and felt their responses were clear. Wilson understood the grandparents did not want to adopt because they wanted to remain the grandparents and raise the children. Kirk also stated that he feared for mother's safety, he did not want to hurt or damage mother, and he wanted to maintain his family.

In Wilson's opinion, it would be detrimental to the children to remove them from the grandparents' home, as they had lived with the grandparents for a year and been in the grandparents' home on and off all their lives. Wilson believed the grandparents were willing and capable of providing the children with a stable and permanent environment, as they were meeting the children's needs and had a "very loving" relationship with them. The grandparents had good jobs and adequate wages, but needed some assistance to provide for the children financially, such as medical and "Kin-GAP" (Kinship Guardianship Assistance Payment Program). Wilson did not believe the grandparents were unwilling to adopt because they did not want to accept

financial responsibility for the children. In her 10 years as an adoption specialist, Wilson had only encountered this reason for not wanting to adopt, i.e., wanting to remain the grandparents and raise the children, in two other cases. Ultimately, Wilson recommended guardianship because it was in the children's best interests. Wilson thought the children would benefit from continuing visitation with mother as long as she was compliant with her medications and acted appropriately.

Brenda testified she had spoken with the children's attorney on the telephone, who told her he was going to contest the guardianship recommendation because he wanted her to adopt the children. Brenda felt the attorney was trying to force or pressure her to adopt the children; she told him she did not want to adopt, she wanted to be the children's legal guardian. In Brenda's view, as a grandparent she would be the children's parent for life no matter what. The children's attorney sent an investigator, Margarita Reyes, to see Brenda, who Brenda felt also was trying to pressure her to adopt. Brenda explained that she did not want to adopt because "I'm their grandparent, I'm—these are my grandbabies. I was seeing my grandbabies every weekend[.] I picked them up. I'm going to be a grandma for life, that's why I don't know—I'm their grandmother, I'm granny."

Brenda realized the selection of a permanent plan was about the children "and the best interest of the kids is they're with me, and stability-wise, permanent-wise, I want them with me." She wanted to be the children's legal guardian and wanted the children with her permanently. Brenda had some concerns about taking legal responsibility for the children, since anything can happen as the children get older. For example, K.H. had been taken to a genetic specialist who saw some problems and Brenda was concerned that she might have serious problems as she got older. Despite this, Brenda wanted to give the children a permanent placement with her as she had already been doing, since she was legally their grandmother and she wanted to exercise her right as the grandmother to have the children stay with her under legal guardianship. Brenda did not have a problem with stepping up and being a parent to the children, but she did not want to be made to do something she did not want to do. Brenda was willing to care for the children full time, raise them in her home and provide them with the things they need. Brenda testified the children had been visiting with mother about once per week and the visits, which lasted from one to two hours depending on mother's mental state, were going well. According to Brenda, the children loved the visits and enjoyed mother.

Reyes testified she met with Brenda and the children in February. According to Reyes, Brenda told her that she would have loved to adopt the children, but it looked like they were going along with long-term legal guardianship, which she preferred because there would be considerable additional cost to adopt the children and it would be a difficult process to go through. Reyes said Brenda told her that mother's right to get the children back would end if Brenda adopted them. Brenda told Reyes in another conversation that she was also concerned she would lose funding for the children if she adopted them.

After hearing oral argument, the juvenile court took the matter under submission. At the continued hearing, the juvenile court delivered its oral statement of decision. The court found that there were exceptional circumstances present, which case law had interpreted as designed to achieve the best interests of the children, as mother had a mental illness but still visited the children under the grandparents' supervision, which visits might end if parental rights were terminated and the children placed for adoption. The court also stated that while it was not exactly clear why the grandparents did not want to adopt, they were willing to provide a permanent, stable home as guardians, and the reasons for not wanting to adopt, which included wanting to be grandparents and support mother, had nothing to do with an unwillingness to accept the legal or financial consequences. The court further found that the grandparents had had the children in their care for a long time, they were committed to the children's care no matter what, and removing the children from the grandparents would be detrimental to them. The court found the appropriate permanent plan was guardianship. Accordingly, the court ordered guardianship as the children's permanent plan, issued letters of guardianship to the grandparents, and dismissed dependency jurisdiction.

## DISCUSSION

■ At a section 366.26 hearing, the juvenile court determines a permanent plan of care for a dependent child—adoption, guardianship or long-term foster care. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50 [82 Cal.Rptr.2d 426]; § 366.26, subd. (b).) Adoption is the permanent plan preferred by the Legislature. (*In re Celine R.* (2003) 31 Cal.4th 45, 53 [1 Cal.Rptr.3d 432, 71 P.3d 787].) If the juvenile court finds that a child is likely to be adopted, it must terminate parental rights and select adoption as the permanent plan unless (1) section 366.26, subdivision (c)(1)(A) (section 366.26(c)(1)(A) or the relative caregiver exception) applies or (2) the court finds a compelling reason for determining that termination would be detrimental to the child due to one of the six enumerated circumstances set forth in section 366.26, subdivision (c)(1)(B). (§ 366.26, subd. (c)(1)(A) & (B).)

Here, the juvenile court ordered legal guardianship as the children's permanent plan pursuant to section 366.26(c)(1)(A), which provides, as pertinent here, the following exception to termination of parental rights: "The child is living with a relative who is unable or unwilling to adopt the child because of circumstances that do not include an unwillingness to accept legal or financial responsibility for the child, but who is willing and capable of providing the child with a stable and permanent environment through legal guardianship, and the removal of the child from the custody of his or her relative would be detrimental to the emotional well-being of the child. . . ." In applying this exception, the juvenile court found that (1) the grandparents were unwilling to adopt the children because of circumstances that did not include an unwillingness to accept legal or financial responsibility for the children, (2) the grandparents were willing and capable of providing the children with a stable and permanent environment through legal guardianship, and (3) removing the children from the grandparents' custody would be detrimental to their emotional well-being.

The children challenge only the first finding, asserting the order selecting guardianship as their permanent plan must be reversed because the Legislature did not intend the relative caregiver exception to be based on the relative's mere preference for guardianship over adoption. Pointing to the language in section 366.26(c)(1)(A) that the relative must be unable or unwilling to adopt "because of circumstances that do not include an unwillingness to accept legal or financial responsibility for the child," the children argue the term "circumstances" must mean "concrete, appropriate circumstances" that make the relative caregiver unable or unwilling to adopt, and a relative caregiver's stated preference for guardianship over adoption is insufficient in itself to establish such circumstances.

The question raised is one of statutory interpretation calling for our independent review. (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672]; *In re D.C.* (2011) 195 Cal.App.4th 1010, 1015 [124 Cal.Rptr.3d 795].) " '[O]ur fundamental task in construing a statute is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.' [Citation.] In this search for what the Legislature meant, '[t]he statutory language itself is the most reliable indicator, so we start with the statute's words, assigning them their usual and ordinary meanings, and construing them in context. If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs. On the other hand, if the language allows more than one reasonable

construction, we may look to such aids as the legislative history of the measure and maxims of statutory construction. In cases of uncertain meaning, we may also consider the consequences of a particular interpretation, including its impact on public policy.' " (*Martinez v. Combs* (2010) 49 Cal.4th 35, 51 [109 Cal.Rptr.3d 514, 231 P.3d 259].)

■ We begin with the plain language of section 366.26(c)(1)(A), which requires the juvenile court to terminate parental rights if a child is likely to be adopted unless "[t]he child is living with a relative who is unable or unwilling to adopt the child because of circumstances that do not include an unwillingness to accept legal or financial responsibility for the child . . . ." The statute clearly states that the relative must be unable or unwilling to adopt the child because of circumstances, and those circumstances must not include an unwillingness to accept legal or financial responsibility for the child.

The term "circumstance" is not ambiguous. It is defined as "[a] condition or fact attending an event and having some bearing upon it; a determining or modifying factor." (American Heritage Dict. (2d college ed. 1985) p. 275.) Here, the event at issue is the relative's inability or unwillingness to adopt the child, the cause of which must be a condition or fact, or a determining or modifying factor, i.e., a circumstance. The only limitation on the circumstances the juvenile court may consider as the cause of the relative's inability or unwillingness to adopt is the relative's unwillingness to accept legal or financial responsibility for the child. The statute does not preclude the court from considering as a circumstance, as the court did in this case, the relative caregiver's preference for legal guardianship due to family dynamics.

■ The children contend the statute cannot be interpreted this way because such an interpretation would remove the juvenile court's discretion to determine whether the relative caregiver exception applies, likening this to cases which have found the delegation of judicial discretion to a third party unlawful. (See, e.g., *In re Julie M.* (1999) 69 Cal.App.4th 41, 48–49 [81 Cal.Rptr.2d 354] [juvenile court abused its discretion in giving the children absolute discretion to decide whether their mother could visit them].) We disagree. In making this determination, the juvenile court must find not only that a circumstance exists which makes the relative unable or unwilling to adopt, but also that the relative's inability or unwillingness is not due to a refusal to accept legal or financial responsibility, the relative is willing and capable of providing the child with a stable and permanent environment through legal guardianship, and removing the child from the relative's custody would be detrimental to the child's emotional well-being. That the circumstances the court may consider are not limited further does not mean the court's power to determine the applicability of the relative caregiver exception has been delegated to the relative caregivers.

The legislative history of the relative caregiver exception, which the Legislature added to section 366.26 in its current form in 2008 through Assembly Bill No. 298 (2007–2008 Reg. Sess.) (Assembly Bill 298), supports our interpretation. Before 2008, the exception to termination of parental rights for a child placed with a relative was contained in former section 366.26, subdivision (c)(1)(D), which provided the following "compelling reason for determining that termination would be detrimental": "The child is living with a relative, foster parent, or Indian custodian who is unable or unwilling to adopt the child because of exceptional circumstances, that do not include an unwillingness to accept legal or financial responsibility for the child, but who is willing and capable of providing the child with a stable and permanent environment and the removal of the child from the physical custody of his or her relative, foster parent, or Indian custodian would be detrimental to the emotional well-being of the child. . . ."

Thus, before 2008, the exception for a relative caregiver applied only if the relative caregiver's inability or unwillingness to adopt the child was due to *exceptional* circumstances. Courts have interpreted the "exceptional circumstances" requirement differently. One court held that "mere family preference" for guardianship over adoption is insufficient. (*In re Rachel M.* (2003) 113 Cal.App.4th 1289, 1298 [7 Cal.Rptr.3d 153] ["mere family preference" for guardianship over adoption does not constitute "exceptional circumstances"].) Another court held that the relative caregiver's "personal preference" for guardianship was irrelevant and did not rebut the "strong presumption" that adoption was the best possible plan for the child where the relative also testified she was willing and able to adopt the child if necessary. (*In re Jose V.* (1996) 50 Cal.App.4th 1792, 1801 [58 Cal.Rptr.2d 684].) In *In re Fernando M.* (2006) 138 Cal.App.4th 529 [41 Cal.Rptr.3d 511] (*Fernando M.*), the court concluded that "[t]he phrase 'exceptional circumstances' should be interpreted in light of the overarching purpose of section 366.26 and the overarching purpose of the dependency system—to achieve the best interest of the dependent child," and if a court "never considered family preference, the term 'unwilling' as used in [former] section 366.26, subdivision (c)(1)(D) would be rendered meaningless." (*Fernando M., supra*, 138 Cal.App.4th at p. 536.)

Noting that California law created "needless barriers to relatives willing, through a legal guardianship, to provide a safe, supportive, and permanent home for children in foster care," the author of Assembly Bill 298 stated the bill was needed to "ensure that foster children in relative care are able to achieve a permanent placement with extended family" as under existing law "relatives willing to provide a permanent home are pressured to adopt—a path some relatives may not favor due to cultural factors or family dynamics—and told that absent adoption the child will be removed from their care." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 298 (2007–2008 Reg. Sess.) as amended Mar. 15, 2007, pp. 4–5.) The bill's author recognized that

dependent children "in the care of relatives experience greater stability and long term success than youth in non-relative care." (*Ibid.*)

Thus, in order to support relative caregivers who opt for legal guardianship over adoption, Assembly Bill 298 was enacted to (1) "prevent caseworkers and judges, who may not fully appreciate why a relative caregiver may not want to adopt the child and may decide that such unwillingness shows a lack of commitment to the child, from pressuring the relative caregiver to adopt the child" by stating "that a relative caregiver's preference for legal guardianship over adoption cannot constitute the sole basis for recommending removal of the child from the caregiver for purposes of adoption, provided the caregiver's preference is not due to an unwillingness to accept legal or financial responsibility for the child";[2] (2) "ensure that children who need permanent and stable homes are not inappropriately removed from loving relative caregivers and put up for adoption with strangers" by changing the order of preference for placement of children so that guardianship by a relative caregiver is second in priority after adoption by a family who is currently seeking to adopt the child;[3] and (3) allow the court to order reunification services to legal guardians. (Assem. Floor, Conc. in Sen. Amends. to Assem. Bill No. 298 (2007–2008 Reg. Sess.) as amended Sept. 4, 2007, pp. 3–4.)

■ It is apparent from the legislative history the Legislature intended that a relative caregiver's preference for legal guardianship over adoption be a sufficient circumstance for application of the relative caregiver exception as long as that preference is not due to an unwillingness to accept legal or financial responsibility for the child. As acknowledged in the legislative history, while the bill might provide incentives for relatives to opt for legal guardianship over adoption, such a result is not necessarily inconsistent with public policy, as "[k]eeping children in homes where they are well cared for and can maintain close familial relationships should take precedence over achieving the termination of parental rights, especially where the relative

---

[2] This amendment is reflected in section 361.5, subdivision (g)(2)(A), which provides that "[a] relative caregiver's preference for legal guardianship over adoption, if it is due to circumstances that do not include an unwillingness to accept legal or financial responsibility for the child, shall not constitute the sole basis for recommending removal of the child from the relative caregiver for purposes of adoptive placement."

[3] The order of preference is stated in section 366.26, subdivision (b), which currently provides the following order: (1) termination of parental rights and placement for adoption by a family currently seeking to adopt, (2) a plan of tribal customary adoption without termination of parental rights, (3) legal guardianship with the relative caregiver, (4) identifying adoption or tribal customary adoption as the permanent goal and order efforts be made to locate an appropriate adoptive family, (5) legal guardianship with a nonrelative, and (6) placement in long-term foster care.

caregiver is the prospective adoptive parent." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 298 (2007–2008 Reg. Sess.) as amended Mar. 15, 2007, p. 7.)

■ In this case, the grandparents testified they were unwilling to adopt the children because they wanted to remain the children's grandparents. There was also evidence the grandparents were willing to accept legal and financial responsibility for the children. This evidence was sufficient to satisfy the element of the relative caregiver exception that they be unwilling to adopt because of circumstances that do not include unwillingness to accept legal or financial responsibility.

The children contend the juvenile court abused its discretion in finding the relative caregiver exception applied because it used the wrong legal standard, as the court in announcing its decision (1) cited *Fernando M., supra*, 138 Cal.App.4th 529, which was decided under former section 366.26, subdivision (c)(1)(D), (2) specifically referenced this former code section, and (3) discussed the "exceptional circumstances" requirement.[4] The children further assert the error was not harmless because the juvenile court's findings do not support the application of the relative caregiver exception under section 366.26(c)(1)(A) as there was no evidence that the grandparents' refusal to adopt was due to "appropriate circumstances."

We question whether an abuse of discretion standard, as opposed to the substantial evidence standard, applies where, as here, the juvenile court made specific findings of fact to support its decision to order legal guardianship under the relative caregiver exception. (See, e.g., *In re Brison C.* (2000) 81 Cal.App.4th 1373, 1378–1379 [97 Cal.Rptr.2d 746].) We need not decide the issue, however, because even if an abuse of discretion standard applies, any error was harmless. The children's argument is premised on their belief that the relative caregiver exception requires something more than the relative caregiver's preference for guardianship as the basis for the relative caregiver's unwillingness to adopt. Since we have rejected that interpretation, the juvenile court's application of an arguably stricter standard of exceptional circumstances is harmless, as the juvenile court made the findings necessary to support application of the relative caregiver exception, namely that the grandparents were unwilling to adopt because of circumstances that did not include their unwillingness to accept legal or financial responsibility for the children.

---

[4] Notably, after the juvenile court explained its rationale for its ruling, children's counsel told the juvenile court that he believed the court meant to refer to section 366.26(c)(1)(A). The juvenile court agreed *it was referencing whatever section matched the relative caregiver* exception, and the written orders repeat the language of 366.26(c)(1)(A).

## **DISPOSITION**

The orders of guardianship as the children's permanent plan are affirmed.

Dawson, J., and Kane, J., concurred.