Filed 5/12/21  In re J.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re J.M. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E076161 |
| Plaintiff and Respondent, | (Super. Ct. Nos. J277011, J277012 & J277013) |
| v. | OPINION |
| A.T. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant, A.T.

Neale B. Gold under appointment by the Court of Appeal, for Defendant and Appellant, T.M.

1

Michelle D. Blakemore, County Counsel, and Svetlana Kauper, Deputy County Counsel, for Plaintiff and Respondent.

## I.

## INTRODUCTION

In separate appeals, A.T. (Mother) and M.T. (Father) (Parents) appeal from a juvenile court order terminating their parental rights to Je. (born in 2013), Ji. (born in 2015), and Ja. (born in 2016). The children were ordered removed from their parents' care and declared dependents of the court based on allegations Parents' failed to protect the children and provide support (Welf. & Inst.Code, § 300, subds. (b) & (g)).[1] Following a contested section 366.26 hearing, the juvenile court ordered Parents' parental rights to the children terminated.

Parents argue the juvenile court erred in denying the parental relationship exception to adoption (§ 366.26 (c)(1)(B)(i)) and terminating their parental rights. Parents join in each other's arguments to the extent they are relevant to each other. We reject Parents' contentions and affirm the judgment.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

---

[1] Unless otherwise noted, all statutory references are to the Welfare and Institutions Code.

From the time of Ji.'s birth in 2015, until July 3, 2018, Parents lived together with the children. After a verbal argument between Parents on July 3, 2018, Mother and the children moved out of the family home.

On July 13, 2018, Mother dropped off the children at her daycare provider's home. She was expected to pick up the children over the weekend, but failed to do so. On July 17, 2018, the family came to the attention of San Bernardino County Children and Family Services (CFS) when it received an immediate response referral alleging caretaker incapacity/absence and general neglect of the children.

During CFS's investigation, the children's maternal grandmother (MGM) reported Mother had called earlier that day and said she had been arrested and incarcerated for solicitation (prostitution), and her handler (pimp), Mr. Fresh, was holding the children hostage to coerce Mother to continue earning money for him. MGM learned later that day that Mr. Fresh had dropped off the children at Mother's daycare, which was where law enforcement found them. MGM told CFS that Father was Ja.'s biological father. Je. had a different father, and Ji.'s father was unknown. The location of the children's fathers were also unknown. Because neither Mother nor Father was available to take the children, CFS temporarily detained the children under exigent circumstances and placed them in foster care.

On July 18, 2018, CFS contacted Father by telephone and notified him of the detention hearing. He was unaware Mother was in custody and denied knowing Mother was soliciting. He told the CFS social worker that all he knew was that Mother "'left

with the kids, got into some things, and got the kids taken away; this has nothing to do with me.'" Father said he planned to protect the children by keeping them in his custody and telling Mother, if she showed up, that she could not see them or he would call CFS.

On July 19, 2018, CFS filed a section 300 petition under subdivisions (b) (failure to protect) and (g) (no provision for support) on behalf of the children. CFS alleged the children were at risk because of Mother's unsafe lifestyle and incarceration, and because she left the children with an inappropriate caretaker. CFS also alleged the children's fathers had failed to provide support and protection for the children, and Je. and Ji.'s fathers' whereabouts were unknown.

Both Mother and Father appeared at the detention hearing the following day. Father, through his attorney, informed the court he was the biological father of Ja. and also the presumed father of Ji., because he raised the child since birth. Mother informed the court that she and Father did not marry. She further confirmed that Father was Ja.'s biological father, he was present at Ja.'s birth, and he was named on Ja.'s birth certificate. Mother stated that Father was not Ji.'s biological father. Her father's name was not on her birth certificate, and Ji. had never met her biological father. Ji. had lived with Father since her birth and knew him as her only father. Je. also had a different father, who was present at his birth and was named on Je.'s birth certificate. The children all called Father "dad."

The court ordered, assessment of Father's home in Kern County, where the family had been living since Ji.'s birth, until Mother moved out with the children. The juvenile

4

court ordered the children temporarily detained in CFS's custody, with supervised weekly visitation ordered once a week for two hours for both parents. On August 30, 2018, the children were placed with their paternal grandmother (PGM).

In October 2018, Parents participated in mediation and submitted on jurisdiction and disposition. During the jurisdiction/disposition hearing, the court sustained the petition, found Father to be the presumed father of Ji. and Ja., and ordered reunification services for Parents, Parents to receive supervised visitation once a week for two hours, and the children to remain with PGM.

CFS reported in its six-month status review report filed on April 9, 2019, that Mother was participating in some services. Father had not attempted to participate in any of his services. He informed the social worker that he did not have time to do anything on the case plan and felt he should not have to because he did not do anything wrong. He stated Mother was entirely at fault for the dependency case. CFS further reported that the children were doing well in PGM's home and Parents visited them weekly. The children were excited to see Parents during visits, during which Parents interacted appropriately with the children.

At the six-month status review hearing on April 9, 2019, the court terminated Father's reunification services. The court continued Mother's reunification services. The court ordered that supervised visitation for Parents continue once a week for two hours.

CFS reported in its status report filed on August 19, 2019, that on May 25, 2019, Mother was arrested for theft-related charges. She was incarcerated from May 25 until

July 31, 2019. Upon her release, Mother was placed on probation for five years. Mother told CFS she had consistently visited the children, with the exception of when she was incarcerated. CFS recommended terminating Mother's reunification services and setting a section 366.26 hearing (.26 hearing). CFS believed it was unlikely the children would be returned to Mother. There was a lack of proof she had participated in her case plan and a gap in visitation while she was incarcerated. Mother also did not have stable employment or housing.

PGM reported that Father attempted to visit the children weekly but at times his work schedule did not allow him to do so. Father failed to maintain contact with CFS. The children reportedly were doing well in PGM's care and were closely bonded to her. They appeared safe, stable, and happy. The social worker concluded it would be detrimental to the children to remove them from PGM. PGM was willing to provide permanency for the children as their guardian or by adoption.

On October 15, 2019, CFS filed a supplemental report stating that on October 10, 2019, PGM told CFS she was willing to adopt the children if reunification failed. She also stated she was willing to maintain contact between the children, Mother, and the maternal relatives. CFS reported that the social worker told Mother it appeared Mother did not benefit from services because Mother was rearrested. Mother responded it was not the first or last mistake she would make, and objected to CFS holding her accountable for everything in the future. Mother stated she believed CFS had incorrectly alleged that

6

her children were removed because she had made inappropriate, unsafe arrangements for the children's care and provisions.

Mother reported she had completed a 10-week parenting program, was employed working security for various events, and was living in an apartment in Los Angeles. Mother said she was willing to continue engaging in reunification services. CFS reported it was concerned Mother continued to minimize the concerns that brought the family to CFS's attention.

During the 12-month review hearing on November 7, 2019, the court terminated Mother's reunification services and set a .26 hearing. The court maintained Parents' supervised visitation as previously ordered.

CFS reported in the .26 hearing report filed on February 27, 2020, that the children were developmentally on target and there were no concerns regarding their mental or physical health. Twice a month the children had been visiting Mother and MGM. The visits went well. Mother also maintained telephone contact with the children during the weeks she did not visit them. Father also had been visiting the children every other week. The children enjoyed their visits with Parents. PGM was willing to continue facilitating visits with Parents and other relatives.

CFS further reported that since the children's placement with PGM in August 2018, the children had developed a strong attachment with PGM and her family. The children were comfortable in her care and viewed PGM as their parental figure. PGM had known Father's biological son, Ja., all of his life and had known Ji. since she was six

7

months old. PGM had known Je. since he was a year old. At one point, the children and Parents had lived with PGM for four months. Je. and Ji. stated they wanted to continue living with PGM. PGM wished to adopt the children. She provided them with a structured, nurturing, and stable environment for over two years.

At the contested .26 hearing on November 19, 2020, Mother objected to PGM adopting the children and urged the court to apply the parental relationship exception to adoption. She believed adoption would be detrimental to the children. Mother asserted the children were happy to see her when she arrived for visits, and were upset and cried when the visits ended. The children called her and Father "Mom" and "Dad," and called PGM "granny." Mother acknowledged that the children's placement with PGM was "good," because the children were well taken care of and the children were bonded to PGM.

CFS urged the court to terminate parental rights. The children's counsel also stated adoption was appropriate. Mother's counsel requested a lesser permanent plan because she had consistently visited the children. Father's counsel also urged a lesser permanent plan and noted Father had a very strong relationship with the children.

After hearing oral argument and considering the evidence, including Mother's testimony, the juvenile court found Parents had demonstrated they had met the first prong of the parental relationship exception to adoption by consistently visiting the children. However, the juvenile court found Parents had not met the second prong, which required that "the parents must occupy a parental role and not just be a friendly visitor." In

8

addition, the court found that the benefits of adoption outweighed the benefits of maintaining a parent-child relationship. The court explained that Parents "do not occupy a parental role and have not for quite some time." The juvenile court therefore terminated parental rights and freed the children for adoption. Parents appeal the November 19, 2020 order terminating their parental rights.

III.

PARENT RELATIONSHIP EXCEPTION

Parents contend the juvenile court erred in not applying the parental relationship exception to adoption. (§ 366.26 (c)(1)(B)(i)) We disagree.

A. *Law Regarding the Parental Relationship Exception*

Termination of parental rights and adoption must normally be ordered if the juvenile court finds a child is adoptable unless the court finds "a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "[T]he burden is on the party seeking to establish the existence of one of the section 366.26, subdivision (c)(1) exceptions to produce that evidence." (*In re Megan S.* (2002) 104 Cal.App.4th 247, 252.)

"We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would

9

be detrimental to the child." (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395; accord, *In re E.T.* (2018) 31 Cal.App.5th 68, 76; *In re Caden C.* (2019) 34 Cal.App.5th 87, 106-107, rev. granted July 24, 2019 (S255839).) "'[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only "'if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did.' . . ."'" (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)

B. *Parents' Relationship With the Children*

Parents contend the juvenile court erred in rejecting the parental relationship exception. We disagree. We conclude substantial evidence supported the juvenile court's findings there was not a beneficial parental relationship, and there was no abuse of discretion in the court determining that termination would not be detrimental.

It is undisputed that Parents met the first prong of the parental relationship exception of regularly visiting the children. With the exception of when Mother was incarcerated in 2019, Parents regularly visited the children, initially once a week for two hours, with visits supervised. After termination of services, visits remained supervised and were generally every other week for two hours.

Parents, however, have not demonstrated they met the second prong of the parental relationship exception of holding a beneficial parental role in the children's lives

10

at the time of the section 366.26 hearing.  Parents also have not demonstrated that the children would suffer any significant detriment from terminating parental rights.

"The factors to be considered when looking for whether a relationship is important and beneficial are:  (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467.)  "Interaction between natural parent and child will always confer some incidental benefit to the child.  The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation.  [Citation.]  The relationship arises from day-to-day interaction, companionship and shared experiences.  [Citation.]  The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

"Evidence of 'frequent and loving contact' is not sufficient to establish the existence of a beneficial parental relationship." (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1315-1316; see also *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418.)  Once a dependency case reaches the permanency planning stage, the statutory presumption is that termination is in an adoptable child's best interests and, therefore, not detrimental. (§ 366.26, subd. (b); *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343-1344.)

11

Parents argue that under a plan of legal guardianship, the children's relationship with Parents would be preserved while maintaining the children's stability and permanency in PGM's home. They assert the trial court should have applied the parental relationship exception to adoption based on the following reasons: (1) the children had a loving, positive relationship with Parents; (2) PGM is committed to maintaining the children's relationship with Parents; (3) PGM is committed to caring for the children; and (4) there is no evidence guardianship would jeopardize their placement with her. Parents contend the children would benefit from a permanent plan of guardianship by being allowed to maintain their existing relationship with Parents while also enjoying the benefits of a stable environment with PGM.

We begin with the well-established premise that adoption is the preferred permanent plan. (§ 366.26, subd. (c)(1); *In re K.H.* (2011) 201 Cal.App.4th 406, 414.) Termination of parental rights and adoption must thus normally be ordered if the juvenile court finds a child is adoptable unless the court finds a compelling reason for determining that termination would be detrimental to the child. (§ 366.26, subd. (c)(1)(B)(i).) Here, the trial court reasonably found that Parents' relationship with the children did not provide a compelling reason for determining that termination would be detrimental to the children. There was insufficient evidence of a significant, beneficial parental bond, particularly as to the youngest child. There also was little, if any, evidence the children would suffer detriment from the court terminating parental rights. Thus, any detriment from not continuing their relationship with Parents was outweighed by the benefits of

12

security and the sense of belonging that the prospective adoptive parent, PGM, would confer through adoption. (*In re E.T.*, *supra*, 31 Cal.App.5th at p. 77.)

The juvenile court reasonably found that Parents' frequent contact with the children was not sufficient to establish a beneficial parental relationship exception. (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 645; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622.) Although Parents regularly visited the children and maintained a relationship with them, the juvenile court reasonably found that Parents' relationship with the children during the dependency proceedings was that of a friendly visitor, rather than that of a parent. They had fun, enjoyable visits together and the children called Mother and Father, "Mom" and "Dad." However, Parents did not hold a parental role, disciplining the children and providing for their everyday needs. Parents had not lived with the children for over two years, since the inception of the juvenile dependency proceedings, and their visits had remained short and supervised. In addition, when the children were removed from Parents, they were young. Ja. was only a year old, Ji. was three years old, and Je. was four years old. With the exception of possibly Je., the children likely had very limited memory, if any, of living with Parents.

Father did not hold a parental role even before the children's removal. He had lost contact with his children, such that he was not available to take the children when they were removed from Mother. Furthermore, because he had not stayed in touch, he was unaware of Mother's failure to care appropriately for the children and protect them. Father also demonstrated minimal commitment to reunifying with the children. His

13

reunification services were terminated after just six months because he failed to make any progress in complying with his case plan. He conveyed to CFS that he was not responsible for the children being detained or for the juvenile dependency proceedings. He therefore felt it was not fair that he should have to comply with his case plan.

On the other hand, PGM had cared for the children for much of their young lives, serving as a parental figure and providing the children with a stable, nurturing environment. PGM and the children were closely bonded and the children were comfortable in her care. The older two children stated they wished to continue living with PGM. PGM had known all three children from an early age, even before the juvenile dependency proceedings. PGM was committed to adopting the children. CFS reported it would be detrimental to remove the children from PGM's home We thus conclude there was substantial evidence supporting the trial court's finding Parents did not hold a parental relationship with the children when the court terminated parental rights.

We also conclude the trial court did not abuse its discretion in concluding that adoption would cause little, if any, detriment to the children. Parents acknowledged they were unable to take custody of the children. In addition, the prospective adoptive parent, PGM, had told CFS several times during the dependency proceedings that she was committed to facilitating the children's visits with Parents in the future, assuming visits were appropriate, thus allowing the children's relationship with Parents to continue.

The trial court exercised reasonable discretion in concluding that any detrimental impact on the child from terminating parental rights was outweighed by the benefit to the children of adoption. Adoption would greatly benefit the children in conferring a sense of security, stability, and belonging not provided to the same degree as other lesser permanent placement plans, such as guardianship. Adoption was appropriate based on substantial evidence demonstrating PGM was committed to providing a nurturing, stable, loving home for the children, as she had done so throughout much of the children's lives, while also allowing Parents to maintain their relationship with the children.

The trial court thus reasonably concluded it was in the children's best interests to terminate parental rights and free the children for adoption by PGM. This would ensure the children would permanently remain in PGM's loving, nurturing, stable home, which outweighed any detriment from terminating parental rights rather than placing the children in a less permanent plan of guardianship.

IV.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

McKINSTER

15

Acting P. J.

FIELDS

                             J.