Filed 6/3/25  In re B.S. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| In re B.S., a Person Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> M.S. et al, <br><br> Defendants and Appellants. | F089023 <br><br> (Super. Ct. No. JD144723-00) <br><br><br> **OPINION** |

**THE COURT**\*

        APPEAL from an order of the Superior Court of Kern County.  Christie Canales Norris, Judge.

        Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant S.G.

        Elaine Forrester, under appointment by the Court of Appeal, for Defendant and Appellant M.S.

        Margo A. Raison, County Counsel, and Judith M. Denny, Deputy County Counsel, for Plaintiff and Respondent.

---

\*        Before Franson, Acting P. J., Peña, J. and De Santos, J.

-ooOoo-

S.G. (mother) appeals from a juvenile court order terminating parental rights to her daughter, B.S., who was born in August of 2022. Mother contends the juvenile court erred by terminating parental rights because there was a significant bond between mother and B.S., and thus the court should have applied the parental-benefit exception to adoption pursuant to Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i).[1] M.S. (father) joins mother's argument, stating he was equally prejudiced by the juvenile court's order. We find no error and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Referral, Petition, and Detention*

In early June of 2023, mother was arrested for being under the influence of alcohol while caring for B.S., then nine months old. The police department reported numerous other instances of mother being under the influence while caring for the child. Mother and B.S. were living in a backyard shed without electricity, running water, or a door. Although father claimed B.S. slept inside the residence, nothing in the residence indicated that was so.

Mother was interviewed by a social worker from the Kern County Department of Social Services (department) and claimed B.S. slept in the residence with father and only played in the shed. Mother acknowledged a 20-year history with alcohol abuse, but claimed she stopped drinking heavily when she started AA meetings and that she was nearing her 90-day sober date. Mother denied being intoxicated when she was arrested. Mother also denied "fighting" with father, and claimed only to be "arguing."

Mother had two previous dependency cases involving other children: one in 2003 and one in 2009. One of those children was adopted; the other resides with the father

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

2.

who has full custody. Both cases were due to mother's alcohol and drug use and general neglect of the child. Mother also had approximately 38 alcohol related arrests, which resulted in approximately 20 convictions between 2002 and 2022.

A section 300 petition was filed on June 6, 2023, alleging father's inability to supervise or protect B.S. (§ 300, subd. (b)(1)(A)); mother's inability to care for B.S. due to her alcohol abuse (§ 300, subd. (b)(2)(C)); the failure of mother and father to provide adequate shelter for B.S. (§ 300, subd. (b)(3)(D)); that the child was left with no provisions for support due to mother's arrest (§ 300, subd. (g)); and mother's failure to reunify with the B.S.'s half sibling (§ 300, subd. (j)).

A detention hearing was held June 6 and 9, 2023. B.S. was detained and a jurisdiction and disposition hearing scheduled for July 31, 2023.

*Jurisdiction*

The report prepared by the department stated that mother met with the social worker on June 22, 2023, and was told that, due to B.S.'s age, she would have only six months to reunify with her. The following day, mother tested positive for alcohol and cocaine, although she claimed she last drank three days earlier. Mother acknowledged struggling with alcohol, but claimed she was seeking services. The department was unable to contact father to review his case plan.

At the July 31, 2023, jurisdiction hearing, mother's counsel provided an offer of proof that, if mother were to testify, she would say she and B.S. were living in the house, which had utilities, but were in the shed when officers encountered her. Mother also alleged that she was enrolled in substance abuse services and not under the influence when she was arrested. Mother's counsel asked that all allegations be dismissed except the allegation involving mother's previous dependency history, which she was not contesting. Father waived his rights and submitted on the department's report.

The juvenile court found mother's testimony not credible and found true the allegations of the petition, except for the allegation that B.S. had been left without

provisions of support due to mother's arrest. A disposition hearing was scheduled for September 13, 2023.

*Disposition*

The report prepared for disposition documented supervised visits between mother and B.S., in which mother was appropriate and affectionate with the child. Mother was asked to drug test on July 28, 2023, but mother stated she would not come until one of her visitation days. Mother was told the drug tests needed to be random. The department was not able to contact father.

The department recommended mother be bypassed for reunification services pursuant to section 361.5, subdivision (b)(10) and (11).[2] The department opined that any detriment to B.S. would be minimal and offering services to mother would likely be unsuccessful.

An October 2, 2023, supplemental report stated that, as of August 9, 2023, mother had not provided a drug-alcohol test since June 23, 2023. Mother refused to come in when asked to. When the department offered to drug test mother at home, mother agreed, but was not home when the social worker arrived. Subsequently, mother had a negative test on August 23, 2023, but was a no show on September 14, 2023.

---

**2**     As relevant here, section 361.5, subdivision (10) provides that reunification services need not be granted if the court ordered termination of reunification services for any siblings or half siblings of the child because the parent failed to reunify with the sibling or half sibling and this parent has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent.

And section 361.5, subdivision (11) provides that reunification services need not be granted if the parental rights of a parent over any sibling or half sibling of the child had been permanently severed and the parent has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from the parent.

Supervised visits, for the most part, were appropriate until mother and father visited together as they fought with each other during the visits. At times, mother became irritated with B.S. During one visit in September of 2023, mother talked to herself during the entire visit, exclaiming that "the child belongs to her." During another visit, mother had to be escorted out of the visit because her anger and negativity scared B.S.

When father visited with B.S., the visits were appropriate, but he did not always show for scheduled visits.

The disposition hearing was not held until November 7, 2023. Neither mother nor father was present. The juvenile court ordered father reunification services; it denied mother reunification services as she met the bypass provisions of section 361.5, subdivision (b)(10). A six-month review hearing was set for father pursuant to section 366.21, subdivision (e) for May 7, 2024.

*Mother's First Section 388 Petition*

On January 2, 2024, mother filed a section 388 petition requesting B.S. be placed with her under family maintenance services or that she be offered reunification services. Mother submitted documents showing that she had enrolled in parenting and substance abuse counseling. The department recommended denying mother's petition, stating that mother's three negative drug tests showed changing but not changed circumstances, considering her extensive alcohol abuse history. The juvenile court denied mother's request, agreeing with the department that mother had not showed changed circumstances. or why it was in B.S.'s best interests.

*Mother's Second 388 Petition/Father's Six-Month Review Hearing*

Mother filed a second section 388 petition on April 29, 2024, asking for family maintenance services. In doing so, she alleged she had completed all of her case plan with the exception of substance abuse, which she would complete by May 1, 2024. Mother had also secured housing and had visited B.S. consistently. Mother provided

documents in support of her petition.  Hearing on the petition was scheduled to coincide with father's review hearing.

The department filed a social study recommending that mother's section 388 petition be denied.  Mother completed 21 out of 26 parenting and neglect classes, but she was discharged due to breach of her attendance contract and financial agreement.  Mother also could not provide an alcohol test for the department due to insufficient urine.

At the June 3, 2024, hearing, mother testified that she attended AA meetings, "[w]hen I can," but also that she had not attended any yet and did not have a sponsor.  Mother testified that she no longer had an alcohol problem and said she never had a problem previously.

The department recommended the petition be denied, as mother continued to deny ongoing alcohol use and it was in the best interest of B.S. that she have stability.

The juvenile court agreed with the department that there were inconsistencies with mother's testimony as to when she last drank.  It was also concerned that mother was unable to give a urine sample and that she continued to deny that she ever had an alcohol problem.  The juvenile court noted that mother had been "arrested or cited at least 52 times for alcohol related events, and pleading no contest or guilty to drunk in public 27 times" between 2003 and the present.  The juvenile court denied the petition, finding that mother had not presented any evidence as to why it would be in B.S.'s best interests to be with mother at this time.

As for father's review hearing, the juvenile court found father had not made acceptable efforts to reunify with B.S. and had not availed himself of services provided.  Services were ordered terminated, and a section 366.26 hearing was scheduled for October 1, 2024.

### Section 366.26 Hearing Report

The department's report prepared in anticipation of the section 366.26 hearing recommended termination of parental rights and a permanent plan of adoption for B.S.

B.S. had been with the same caregivers since her placement on June 2, 2023. She met all developmental milestones and looked to her caregivers for daily physical and emotional needs. Mother's relationship with B.S. was described as a "visiting relationship." The report stated that mother could have visited B.S. 77 times in person but did so only 50 times. While mother was largely appropriate with B.S. during visits, B.S. did not cry after visits and left the visits without incident. An August 7, 2024, visit was highlighted in the report. During that visit, mother allowed B.S. to play with a broken umbrella and poke herself in the eye, eat ice off of the floor, eat lotion out of a bottle, and try to eat ChapStick, which she smeared all over her body, all without any redirection from mother.

At a March 7, 2024, visit with father, B.S. became upset with father, pushed him away, and screamed and kicked without father being able to calm her down. B.S. begged for the social worker. Father was described as not consistent with his visits and that B.S. looked to the caregivers to meet her daily physical and emotional needs.

The scheduled section 366.26 hearing was continued from October 1, 2024, to December 2, 2024, in order to allow the department to conduct a diligent search for father and to provide him with notice of the hearing.

*Mother's Third Section 388 Petition*

Before the scheduled December 2, 2024, section 366.26 hearing, mother filed a third section 388 petition on November 7, 2024, asking that she receive reunification services. In her petition, mother stated that she continued to attend AA meetings, had a sponsor, gained insight into her addiction, has maintained sobriety, and maintained housing. Mother attached an AA sign in sheet for five dates. The juvenile court set mother's section 388 petition for a prima facie hearing on December 2, 2024, to coincide with the section 366.26 hearing.

*Section 388 and Section 366.26 Hearing*

At the December 2, 2024, hearing, the juvenile court first took up mother's section 388 petition, which it denied. The juvenile court found mother had not shown any

substantial participation in AA, as her documentation showed only participation in five meetings. The juvenile court concluded mother had not made a sufficient showing of changed circumstances or shown how it would be in B.S.'s best interests to be placed with her.

The juvenile court then took up the section 366.26 hearing. Mother testified that she had consistently visited with B.S., that B.S. calls her " 'mommy' " and gives her hugs and kisses, that she comes to her when she wants to go to another side of the playground or when she needs to use the restroom, and she plays and laughs when she is with mother. Mother testified that B.S. would benefit from a continued relationship with her because she is her mother, and she had stayed sober for a year and attended AA meetings.

Mother's counsel asked that the juvenile court apply the beneficial parent-child relationship exception, stating mother had only missed one visit and B.S. had missed a few and the report that she had missed more "seems a little bit off." Counsel argued that mother had met her burden of visiting regularly and consistently. Counsel also argued there was a positive relationship between B.S. and mother, that B.S. lived with mother the first nine months of her life, and that mother had completed her case plan and remained sober.

Father's counsel stated only that father was in support of mother's request.

B.S.'s counsel argued that, even if mother had visited consistently, she had not provided any evidence to show that the benefit to B.S. of not terminating mother's parental rights would outweigh the positives of permanency in this case.

Counsel for the department agreed with B.S.'s counsel and added that the evidence did not show the relationship between mother and B.S. to be substantial and positive. Even conceding for the sake of argument on the issue of visitation, counsel noted that B.S. showed no distress at the end of visits or had any other indicia that it would be severely detrimental to B.S. to terminate her relationship with mother.

The juvenile court found clear and convincing evidence that B.S. was likely to be adopted. The juvenile court found that mother had met the first prong of the beneficial relationship exception in that she had regularly and consistently visited with B.S., but it did not find that father had done so, as he had visited 39 out of 106 times. As for the second prong of the beneficial relationship exception, the juvenile court found that, even while the visits were positive, there was no substantial emotional attachment of B.S. to mother and the visits ended without any issue. As for the third prong, the juvenile court stated that it must weigh the detriment of severance versus the benefits of adoption. Noting that B.S. had been out of the home for almost a year and a half and that there might be "some detriment," there was no evidence to show that the detriment would outweigh adoption. The juvenile court terminated mother and father's parental rights, freeing B.S. for adoption.

## DISCUSSION

Mother and father contend that the juvenile court incorrectly found that the beneficial parental relationship exception to adoption did not apply. The department disagrees, as do we.

Under section 366.26, subdivision (c)(1), once a child is found likely to be adopted, the juvenile court "shall terminate parental rights and order the child placed for adoption." When reunification efforts have failed, adoption—with its concomitant termination of parental rights—is " 'the legislative preference' " over alternatives like guardianship or long-term foster care. (*In re Celine R.* (2003) 31 Cal.4th 45, 53 [adoption is "the norm"]; see *In re K.H.* (2011) 201 Cal.App.4th 406, 414.) Juvenile courts must therefore choose adoption and termination of parental rights as the permanent plan in all but those " ' "exceptional circumstances" ' " where the parent "can establish termination would be detrimental to the child under one of the statutory exceptions." (*In re Dy.P.* (2022) 76 Cal.App.5th 153, 163.)

9.

The beneficial parental relationship exception to adoption requires a parent to establish, by a preponderance of the evidence, "that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 629 (*Caden C.*); see § 366.26, subd. (c)(1)(B)(i).)  We review a juvenile court's findings regarding the first two elements—regular visitation and a beneficial relationship—for substantial evidence and the court's "ultimate decision" on the third element for abuse of discretion. (*Caden C., supra,* at pp. 639-640.)  The juvenile court's determination on the first two elements "should 'be upheld if ... supported by substantial evidence, even though substantial evidence to the contrary also exists and the [juvenile] court might have reached a different result had it believed other evidence.' " (*Id.* at p. 640.)  In reviewing the juvenile court's exercise of its discretion, we do not substitute our own judgment when two or more inferences can reasonably be drawn from the facts. (*Id.* at p. 641.)  A juvenile court "abuses its discretion only when ' " '[it] has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Ibid.*)

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C., supra,* 11 Cal.5th at p. 632.)  Here, the juvenile court found this element satisfied as to mother, and no party disputes its finding that mother maintained visitation with B.S.

"As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' " (*Caden C., supra,* 11 Cal.5th at p. 632, quoting § 366.26, subd. (c)(1)(B)(i).)  The "focus is the child.  And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Caden, C., supra,* at p. 632.)  In assessing the

10.

character of the relationship, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Ibid.*) The "parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Id.* at p. 636.)

The juvenile court found this second element was not satisfied, and mother contends that the court's finding lacks substantial evidence. Mother cites evidence of continued department reports showing positive visits between mother and B.S. She contends B.S. bonded with her the first nine months of her life and, during visits, B.S. was calm and relaxed with mother, B.S. attempted to communicate with mother while interacting with her, and mother was able to soothe B.S. when she was fussy. Mother also states that, during visits, B.S. wanted mother to hold her, to cuddle and comfort her, and that mother tried to teach B.S. to speak, she read to her, and she was loving and attentive to B.S. Other reports stated that, during visits, B.S. shared toys with mother, hugged her, and smiled at her. At the section 366.26 hearing, mother testified that B.S. would call her "mommy" and give her a hug and kisses, she interacted and laughed with mother, and B.S. enjoyed her time with mother. Mother testified that she thought B.S. would benefit from a continued relationship because she's "her mom" and she had been "staying sober."

Still, this evidence does not negate the substantial evidence that supported the juvenile court's finding that B.S. would not benefit from continuing the relationship with mother. (*Caden C., supra,* 11 Cal.5th at pp. 636, 640.) While many of the visits between mother and B.S. were positive and affectionate, B.S. did not experience distress at the end of any visits and had no trouble returning to her caregivers. (See *In re Katherine J.* (2022) 75 Cal.App.5th 303, 318 ["beneficial relationship exception demands something more than the incidental benefit a child gains from any amount of positive contact with her natural parent"].) In the fall of 2023, B.S.'s caretaker reported that, while B.S. does

11.

not have any behavioral issues after visits, at times B.S. would cry before visits because she wanted to stay with the caregiver.

Not all interactions between mother and B.S. were consistently positive. At one visit in September of 2023, mother demanded that the social worker hand over B.S. so she could visit with her. Mother tried to pull B.S. from the social worker, causing B.S. to become scared of mother. (See *Caden C., supra,* 11 Cal.5th at p. 632 [one consideration for the second element is positive or negative effect of interaction between parent and child].)

Even if the juvenile court's adverse finding on the second element was unsupported, we would still affirm because the court did not abuse its discretion at the third step in weighing the detriment to B.S. of losing her relationship with mother. For the third element—whether "termination would be 'detrimental to the child due to' the child's beneficial relationship with a parent" —the parent "must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra,* 11 Cal.5th at pp. 633-634, 636, quoting § 366.26, subd. (c)(1)(B), italics omitted.) "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C., supra,* at p. 633.) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss," termination is detrimental. (*Ibid.*)

Here, it was reasonable for the juvenile court to conclude that mother had not shown that B.S.'s relationship with her was "so important" that the cost of termination would outweigh the benefit to B.S. of obtaining a final, stable, permanent custody

arrangement through adoption.  (*Caden C., supra,* 11 Cal.5th at p. 633.)  B.S. spent significant portions of her life outside mother's custody—she was nine months old when detained and the section 366.26 hearing took place when she had spent double that amount of time out of mother's custody.  And while B.S. enjoyed the majority of her visits with mother once there, she showed no outward signs of sadness or hesitation to leave at the end of those visits.  While B.S. was too young to articulate her desires for permanency, the social worker observed B.S. to be bonded with her caregivers and fully integrated into their family.  Mother has not shown that the juvenile court's finding that the harm in terminating her parental rights would outweigh the benefits to B.S. of adoption reflects an abuse of discretion.  (*In re Celine R., supra,* 31 Cal.4th at p. 53.)

**DISPOSITION**

The order terminating parental rights is affirmed.