Filed 12/22/23 In re J.J. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re J.J., a Person Coming Under the Juvenile Court Law. | B328838 (Los Angeles County Super. Ct. No. 20CCJP06178A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>A.J.,<br><br>    Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Stephen C. Marpet, Commissioner. Conditionally affirmed with directions.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Avedis Koutoujian, Deputy County Counsel, for Plaintiff and Respondent.

_____

A.J. (father) appeals from the juvenile court's order terminating parental rights over his son, J.J., under Welfare and Institutions Code[1] section 366.26. Father contends it was error to deny him the right to present evidence at the section 366.26 hearing. He further contends the court erroneously failed to ensure compliance with the inquiry provisions of the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) and related California statutes (Welf. & Inst. Code, § 224 et seq.).

We conditionally affirm and remand the matter solely for the court to ensure compliance with ICWA and related California statutes.

### FACTUAL AND PROCEDURAL BACKGROUND
### 1. Initial Proceedings and Reunification Period

In October 2020, the Los Angeles County Department of Children and Family Services (Department) received a referral from a reporting party with safety concerns for J.J., a one-week-old baby, due to mother's mental health issues and excessive

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

2

discipline history with J.J.'s 13-year-old half-sibling.[2] The half-sibling had already been removed from mother in Ohio on suspicion of excessive physical discipline and child trafficking. There was also a history of domestic violence by father against mother. There were two active protective orders protecting mother from father until August 2022, and March 2030, respectively.

In November 2020, J.J. was detained pursuant to a protective custody warrant and the Department filed a petition under section 300 alleging risk of serious physical harm to J.J. During the jurisdiction and disposition hearing in December 2020, the juvenile court sustained the allegations, declared J.J. a dependent, removed him from parents' custody, and ordered family reunification services and monitored visitation for each parent.

By March 2021, J.J. was placed with his paternal grandmother (PGM). At the six-month review hearing in June 2021, the court found father to be in substantial compliance with the reunification order and ordered continued family reunification services, allowing father unmonitored visits with J.J.

On November 14, 2021, during an unmonitored visit with J.J., father called the police complaining mother was intoxicated and banging on his door demanding to see J.J. Father was arrested on suspicion of domestic violence and J.J. was returned to PGM. Charges were later dismissed but father was subsequently arrested on a probation violation instead. In May

---

[2]    Mother is not a party to the current appeal.

2022, father was sentenced to four years in prison with a potential release within 8 to 18 months. At the combined 12 and 18-month review hearing in June 2022, the juvenile court followed the Department's recommendation by terminating family reunification services and set the matter for a section 366.26 hearing.

## 2. *Permanency Planning*

According to the Department's November 29, 2021 service log, aware of the domestic violence incident two weeks prior, PGM[3] stated she was "willing to provide permanency for [J.J.] whether it is to adopt him or to be his legal guardian." The Department reported as such in its December 16, 2021 Status Review Report for the 12-month review hearing. Thereafter, during a December 22, 2021 home visit, when a social worker discussed J.J.'s need for stability whether with father or PGM, PGM stated she was willing to adopt J.J. to keep him safe from mother and father.

Then, during a home visit on April 12, 2022, PGM stated although she was "open to adoption," she preferred legal guardianship because father did not want her to adopt. During a home visit on May 16, 2022, however, PGM reiterated her willingness to adopt J.J. "to ensure that he is [safe] and not around his [parents'] drama." She explained that her intentions were not to keep J.J. from his parents, but to ensure J.J. was

---

[3]     The service log indicates contact with "MGM" or the maternal grandmother, then changes mid-paragraph to "PGM" or the paternal grandmother. J.J. began living with PGM in March 2021, thus, "MGM" appears to be a typographical error.

raised in a safe and healthy environment. She further explained that although she had no doubt J.J.'s parents loved him, they did not make the best decisions regarding J.J. Accordingly, the Department reported in its May 23, 2022 Status Review Report that PGM "desires to provide permanency for [J.J.] through adoption should the parents be unable to reunify with him" and that "[s]he wants to raise [J.J.] in a safe and loving home environment, where he is not exposed to abusive behaviors."

On June 10, 2022, the juvenile court set a section 366.26 hearing for October 5, 2022 "to address the best permanent plan for the child with the court identifying adoption" and ordered the Department to initiate an adoptive home study. In a July 14, 2022 Concurrent Planning Assessment, PGM acknowledged she was aware of the full legal responsibility of adoption; that family reunification takes precedence, but if reunification fails, adoption is the preferred alternative plan; and that she was interested in adopting J.J. if reunification with his parents was not possible.

In its September 20, 2022 Addendum Report, the Department requested a continuance of the October 5, 2022 section 366.26 hearing because there were pending reference checks and PGM needed more time to provide documents related to her previous marriages necessary to adopt J.J. The Department also informed the court that PGM appeared to understand the responsibilities inherent with being an adoptive parent and that she was "committed to providing [J.J.] with a stable and loving family environment through adoption." This status was unchanged in the Department's Status Review Report and the 366.26 WIC Report, both filed on September 26, 2022.

During the section 366.26 hearing on October 5, 2022, J.J.'s counsel stated PGM previously indicated to counsel an interest in

legal guardianship, yet the Department's report stated PGM is interested in adoption. J.J.'s counsel requested the Department address this seeming conflict in their next report. No contested hearing was requested by mother or father, but the court suggested and ordered the Department to notice PGM to appear at the continued section 366.26 hearing on January 3, 2023 "so that she can express what her desire is."

Thereafter, in a December 14, 2022 medical evaluation report[4] for J.J., the clinician reported PGM "does plan to adopt [J.J.]; however, there have been no updates regarding court dates." On January 3, 2023, the Department filed a Last Minute Information (LMI) requesting a continuance to determine if PGM is able to provide the aforementioned documents and to "determine if she is fully invested in pursuing the permanent plan of adoption for [J.J.]." The hearing was continued to April 26, 2023.

On April 12, 2023, the Department filed an LMI apprising the court that it received the references they were waiting for and that PGM submitted the documents necessary for adoption. The Department confirmed PGM was still interested in adopting J.J. The Status Review Report for the April 26, 2023 hearing reflected the same.

### 3. *Section 366.26 Hearing*

The section 366.26 hearing was held on April 26, 2023. Father's counsel stated during the hearing:

---

[4]     The medical report was attached to the Status Review Report for the April 26, 2023 section 366.26 hearing.

6

"I did discuss the recommendation with the father this morning via telephone. I discussed with him previously. However, it was supposed to be a legal guardianship rec. The caretaker had been going back and forth for sometime. And if you look at prior notes from, I believe, January, my notes it does state you ordered the caretaker to come back previously because they weren't sure whether it was going to be legal guardianship or adoption. The father -- I spoke to him this morning, he believes that the wishes of the paternal grandmother/caretaker, that he's very close to, is legal guardianship and she's being pressured by the social worker. And he speaks to [J.J.], his son, on a weekly basis. He used to have unmonitored visits before the arrest. He is asking to set it for contest. And LMI on his weekly phone contact with his son and also the wishes of paternal grandmother/caretaker."

The court turned to J.J.'s counsel for a response as it was J.J.'s counsel who, on October 5, 2022, originally requested clarification on whether PGM was interested in legal guardianship or adoption. J.J.'s counsel replied:

"I spoke with the caretaker yesterday. She was still on board with the plan of adoption. In fact, she thought the adoption was happening today based on her conversation with the social worker. I haven't spoken to her about legal guardianship as an alternative, at this point, because the plan was

7

always adoption. I don't have an objection to – I do understand that [J.J.] has a relationship with his father. They talk every single week. So I don't have an objection to discussing the idea of legal guardianship. That was not the plan she was on board with as of today."

The court responded, "well, it's not a matter of on board. She's ready, willing and able to adopt. There's no real legal basis to continue this matter over, as she indicates, she's ready to adopt." Father's counsel then changed her approach and attempted to argue the parental benefit exception based on the father's regular contact.[5] The court stated based on the facts of this case, the parental benefit exception would not apply either. Thereafter, the court found by clear and convincing evidence that J.J. was adoptable and terminated parental rights.

### 4.    *Facts Related to ICWA*

The Department's Detention Report indicated mother and father denied having any Indian ancestry. Mother and father also denied any Indian ancestry on their Parental Notification of Indican Status form (ICWA-020). During the detention hearing on November 24, 2020, based on the ICWA-020 forms, the court found ICWA inapplicable.

A December 17, 2020 jurisdiction/disposition report stated mother and father again denied having any Indian ancestry. The

---

[5]    On appeal, appellant raised an issue only as to the relative adoption exception under section 366.26(c)(1)(A), and not as to the parental benefit exception under section 366.26(c)(1)(B).

October 5, 2022 366.26 WIC Report, however, indicated PGM told the dependency investigator that there was Native American ancestry in her family but she did not know which tribe. The investigator did not ask PGM for contact information of other relatives who might have more information. The same report indicated mother also stated that she is Native American, but declined to name a tribe or provide relative information. The investigator noted in the report that she left a voicemail for paternal aunt and sent ICWA notices to the Bureau of Indian Affairs (BIA) and Secretary of Interior. These notices are absent in the record, however. In December 2022, mother again indicated she had Indian ancestry in her section 388 petition.

There is no evidence in the record that Department employees made any attempt to contact available maternal or paternal relatives, other than PGM, to ask whether J.J. had any Indian ancestry.

### DISCUSSION

Father asserts the juvenile court violated his due process rights when it refused to set a contested hearing to prove the application of the relative caregiver exception. Father also asserts, and the Department concedes, the ICWA procedure was not followed.

1. ***Father's Due Process Claim***

Father contends his due process rights were violated when the court terminated his parental rights without permitting a contested evidentiary hearing on the applicability of the relative caregiver exception under section 366.26, subdivision (c)(1)(A). We disagree.

A.    Standard of Review

We review the denial of a contested hearing by the trial court for abuse of discretion. (*In re A.G.* (2020) 58 Cal.App.5th 973, 1003 (*A.G.*); *In re Grace P.* (2017) 8 Cal.App.5th 605, 611 (*Grace P.*) Under that standard, the decision of the trial court is given a high degree of deference unless it was arbitrary, capricious, patently absurd, or exceeds the bounds of reason. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319; *In re Earl L.* (2004) 121 Cal.App.4th 1050, 1053.) "[W]hen two or more inferences can be reasonably deduced from the facts, we may not substitute our decision for the juvenile court's decision." (*In re Josiah S.* (2002) 102 Cal.App.4th 403, 419.)

B.    Relative Caregiver Exception

At a section 366.26 hearing, the juvenile court selects and implements a permanent plan for the dependent child, i.e., adoption, legal guardianship, or long-term foster care. (§ 366.26, subd. (b); *In re Noah G.* (2016) 247 Cal.App.4th 1292, 1299.) The preferred plan is adoption. (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 645.) "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.) Once the juvenile court determines by clear and convincing evidence "that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption," unless a statutory exception applies. (§ 366.26, subd. (c)(1).) Father does not dispute the juvenile court's findings of adoptability or inapplicability of exceptions to termination of parental rights. Father claims the juvenile court denied his due

process rights by refusing to permit a contested hearing on whether the relative caregiver exception applies.

It is the parent's burden to prove a statutory exception applies. (*In re Tamika T.* (2002) 97 Cal.App.4th 1114, 1119-1120.) To meet the burden of proving the relative caregiver exception, the parent must show (1) "a circumstance exists which makes the relative unable or unwilling to adopt," (2) "the relative's inability or unwillingness is not due to a refusal to accept legal or financial responsibility," (3) "the relative is willing and capable of providing the child with a stable and permanent environment through legal guardianship, and" (4) "removing the child from the relative's custody would be detrimental to the child's emotional well-being." (§ 366.26, subd. (c)(1); *In re K.H.* (2011) 201 Cal.App.4th 406, 416.)

### C. Due Process and Offer of Proof

A parent has a due process right to present evidence at a section 366.26 hearing. This due process right "includes a meaningful opportunity to be heard, present evidence, and confront witnesses. However, these procedural rights are subject to evidentiary principles. Due process is 'a flexible concept dependent on the circumstance.' (*In re Tamika T.* (2002) 97 Cal.App.4th 1114, 1122.) Since due process does not authorize a parent 'to introduce irrelevant evidence, due process does not require a court to hold a contested hearing if it is not convinced the parent will present relevant evidence on the issue he or she seeks to contest.' (*Ibid.*) 'The trial court can therefore exercise its power to request an offer of proof to clearly identify the contested issue(s) so it can determine whether a parent's representation is sufficient to warrant a hearing involving presentation of evidence

11

and confrontation of witnesses.' (*Ibid.*) The parent's offer of proof must be specific, setting forth the actual evidence to be produced, not merely the facts or issues to be addressed and argued.' (*Id.* at p. 1124.)" *(In re Grace P., supra,* 8 Cal.App.5th at p. 612; see also *In re Jeanette V.* (1998) 68 Cal.App.4th 811, 816-817.) The parent must have "relevant evidence of significant value to the issue before the court." (*In re Tamika T., supra,* 97 Cal.App.4th at p. 1122.)

Unlike a criminal defendant, a parent in a dependency proceeding does not have a right 'to full confrontation and cross-examination' under the Sixth Amendment of the federal Constitution or article I, section 15 of the California Constitution. [Citations.]" (*In re Daniela G.* (2018) 23 Cal.App.5th 1083, 1092; *Maricela C. v. Superior Court* (1998) 66 Cal.App.4th 1138, 1146-1147 (in dependency proceedings, a parent's due process rights do not necessarily include the opportunity for full confrontation and cross-examination].) "[T]he state's strong interest in prompt and efficient trials permits the nonarbitrary exclusion of evidence [citation], such as when the presentation of the evidence will 'necessitate undue consumption of time.' (Evid. Code, § 352.)" (*Ibid.*)

### D. Denial of a Contested Hearing Was Not an Abuse of Discretion

Father contends his offer of proof was sufficient to trigger a contested hearing to establish the relative caretaker exception. He argues *Grace P., supra,* 8 Cal.App.5th 605, and *A.G., supra,* 58 Cal.App.5th 973, are directly on point and it was abuse of discretion for the juvenile court to deny him the opportunity to question PGM on the record regarding her true feelings about

adoption and whether the Department pressured her into accepting adoption over legal guardianship. Father also argues on appeal that he implicitly requested cross-examination of the preparer of the reports to ascertain how, when, and why PGM changed her position on legal guardianship.

In *Grace P.*, father offered to testify about detailed and specific evidence related to the quality of his visitation and parenting of his children during his visits. (*In re Grace P.*, *supra*, 8 Cal.App.5th at p. 614.) He also offered testimony by one of his children on how she enjoyed visits by her father and how she would feel if the visits were terminated. (*Ibid.*) This evidence was offered to prove the child's "benefit from continuing the relationship" and the detrimental impact on the child should the visits terminate, the second prong of the parental benefits exception under section 366.26, subd. (c)(1)(B)(i). (*Ibid.*) In reversing the trial court's rejection of this offer of proof, the *Grace P.* court reasoned that father's offer of proof "was consequential to and probative of the issue of his relationship with the children and the detriment they would suffer by its severance." (*Ibid.*)

In *A.G.*, mother identified nine potential witnesses to testify about regular contact with her children and the nature and quality of the parental relationship. (*In re A.G.*, *supra*, 58 Cal.App.5th at pp. 990, 1007.) In rejecting the trial court's finding that the offer of proof lacked specificity, the *A.G.* court reasoned that although the offered testimonies arguably lacked specificity, there were other materials that demonstrated sufficient specificity. (*Ibid.*) Moreover, "the offer of proof was "plainly relevant to the two components of the parental relationship exception." (*Ibid.*) The *A.G.* court then cautioned, *in the parental benefit exception context* where a parent addressed regular

13

visitation and the existence of a beneficial parent-child relationship, trial courts should be more lenient on reviewing legal sufficiency of the parent's offer of proof. (*Id.* at p. 1009.)

In contrast, here, father's offer of proof in the relative caregiver exception context is devoid of the level of specificity and relevance shown in *Grace P.* and *A.G.* Critically, father fails to identify the witnesses he would call to testify and the content of their testimonies. Father's counsel stated during the section 366.26 hearing, "The father – I spoke to him this morning, he believes that the wishes of the paternal grandmother/caretaker, that he's very close to, is legal guardianship and she's being pressured by the social worker." While father argues on appeal that he proposed to call PGM and implicitly the preparer of the report during the hearing, he made no such request on the juvenile court. In fact, father did not mention any specific witness or the substance of any testimony during his proffer. The court could reasonably infer that father was offering himself as a witness to testify to *his own belief* that PGM was being pressured by the Department to adopt when she preferred legal guardianship. In his opening brief, father states multiple times his offer of proof was based on direct conversations with PGM. Notably, this is not supported by the record either. The foundation offered at the hearing for father's beliefs were based purely on his perception that he had a close relationship with PGM. Such an offer of proof is speculative at best and does not identify relevant, admissible evidence.

Moreover, father's counsel made unsupported statements to the juvenile court as a basis for requesting a contested hearing. Counsel stated, "[t]he caretaker had been going back and forth for sometime. And if you look at prior notes from, I believe,

January, my notes it does state you ordered the caretaker to come back previously because they weren't sure whether it was going to be legal guardianship or adoption." On the contrary, the record reveals once PGM decided she was willing to adopt, she maintained that position throughout. The only hesitation was when PGM expressed preference for legal guardianship because father did not want her to adopt. She never expressed an unwillingness to adopt, however. Based on the record, it appears counsel's perception that PGM was indecisive was due to *J.J.'s counsel* making a request on October 5, 2022 for a follow-up by the Department to clarify whether PGM wanted legal guardianship or adoption. This is why the juvenile court turned to J.J.'s counsel for a response during the section 366.26 hearing, at which time, J.J.'s counsel confirmed that she "spoke with the caretaker yesterday. She was still on board with the plan of adoption. In fact, she thought the adoption was happening today based on her conversation with the social worker. I haven't spoken to her about legal guardianship as an alternative, at this point, because the plan was always adoption." The uncertainty expressed by J.J.'s counsel was the basis for father's offer of proof. That uncertainty proved to be inaccurate, leaving the offer of proof hollow.

Even if the offer of proof was that PGM told father her wish or preference was legal guardianship and she would testify accordingly, it was not arbitrary or capricious for the juvenile court to have concluded that such testimony was inadequate. The court could reasonably conclude that such testimony would only be peripheral to the issue of whether PGM was *unwilling* to adopt despite her preference, and thus, would not rebut J.J.'s adoptability. (See *In re Tamika T.*, *supra*, 97 Cal.App.4th at pp.

15

1118-1119 (affirming juvenile court's denial of contested hearing because mother made no showing rebutting minor's adoptability).) Given the statutory preference for adoption and the record supporting PGM's consistent willingness to adopt, whether PGM wished or preferred legal guardianship would not have been "plainly relevant" or "probative of the issue" of her *willingness* to adopt. Indeed, when J.J.'s counsel offered to discuss legal guardianship even though PGM was "on board" with adoption, the court stated, "It's not a matter of on board. She's ready, willing and able to adopt. There's no legal basis to continue this matter over, as she indicates, she's ready to adopt."

The inadequate offer of proof, coupled with extensive evidence in the record showing PGM's consistent willingness to adopt, demonstrates that it was not an abuse of discretion for the juvenile court to deny father's request for a contested hearing on the application of the relative caretaker exception.

## 2. *ICWA*

"Congress enacted ICWA in 1978 in response to 'rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.'" (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7.) Both ICWA and California law define an "'Indian child'" as a child who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. (25 U.S.C. § 1903(4); § 224.1, subds. (a) & (b); see *In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 783.)

16

California statutory law incorporates the requirements of ICWA and imposes some additional requirements. (*In re Abbigail A.* (2016) 1 Cal.5th 83, 91; *In re Benjamin M.* (2021) 70 Cal.App.5th 735, 741–742.) State and federal law require the court to ask parties and participants at the outset of an involuntary child custody proceeding whether they have reason to know a minor is an Indian child, and to "instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." (25 C.F.R. § 23.107(a); § 224.2, subd. (c); see *Benjamin M.*, at p. 741.) Initial inquiry also includes requiring each party to complete the parental notification of Indian status (ICWA-020) form. (Cal. Rules of Court, rule 5.481(a)(2)(C).)

State law imposes on the Department a first-step inquiry duty to "interview, among others, extended family members and others who had an interest in the child." (*In re H.V.* (2022) 75 Cal.App.5th 433, 438; see § 224.2, subd. (b).) Federal regulations explain that the term "extended family member is defined by the law or custom of the Indian child's Tribe or, in the absence of such law or custom, is a person who has reached age 18 and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 C.F.R. § 23.2 (2017).) When there is "reason to believe that an Indian child is involved in a proceeding," further inquiry is also required. (§ 224.2, subd. (e); *In re T.G.* (2020) 58 Cal.App.5th 275, 290, fn. 14.) "We review claims of inadequate inquiry into a child's Indian ancestry for substantial evidence." (*In re H.V.*, at p. 438.)

The Department concedes on appeal that the further inquiry requirements of ICWA and related state law were not

met in this case and asks us to either conditionally affirm or reverse the juvenile court's order terminating parental rights, with instructions limiting remand of the matter to ordering the juvenile court to ensure compliance with ICWA's requirements.

We agree that the juvenile court erred in finding ICWA inapplicable. The record shows mother and PGM claimed Indian ancestry after the court's November 24, 2020 finding, yet the court proceeded in the absence of any evidence that the Department asked available extended family members about the possibility that minor has Indian ancestry. (See, e.g., *In re H.V.*, *supra*, 75 Cal.App.5th at p. 438 [prejudicial error when Department fails to discharge its first step duty of inquiry]; *In re Benjamin M.*, *supra*, 70 Cal.App.5th at p. 741 [court must ask each participant in child custody proceeding].)

### *DISPOSITION*

The juvenile court's April 26, 2023 order terminating parental rights under Welfare and Institutions Code section 366.26 is conditionally affirmed with directions. The juvenile court is directed to ensure that additional inquiry under section 224.2, subdivision (e) is made with available paternal and maternal relatives, as the court in the first instance deems appropriate, and that any necessary notice be made. Thereafter, if the court determines that no further inquiry under section 224.2, subdivision (e), or notice to tribes under section 224.3 is necessary, then the jurisdiction and disposition orders shall remain in place. If the court determines the Department's investigation was adequate and there is a reason to know the child is an Indian child as that term is defined under ICWA, then the jurisdiction and disposition orders are reversed and the

18

Department shall provide adequate ICWA notice to the tribe or tribes, mother, father, and the regional Bureau of Indian Affairs and shall proceed thereafter in compliance with ICWA and related California statutes.

NOT TO BE PUBLISHED

LEE, J.*

WE CONCUR:

MOOR, Acting P. J.                    KIM, J.

---

* Judge of the San Bernardino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.